## BETHEL *v*. STATE.

### Opinion delivered January 28, 1924.

1. CRIMINAL LAW—INSTRUCTION—HARMLESS ERROR.—Where defendant did not claim that he had married prosecutrix or offered to marry her, giving an instruction in the words of Crawford & Moses' Dig., § 2415, providing that marriage suspends a prosecution for seduction, *held* not prejudicial error.

2. CRIMINAL LAW—OFFER OF COURT TO SUSPEND SENTENCE.—A statement by the court to the jury, in a prosecution for seduction, that if they convicted defendant, and defendant would at any time marry prosecuting witness, the court would suspend the sentence, *held* prejudicial error; not being cured by Gen. Acts 1923, p. 40, authorizing trial courts to suspend sentence.

3. INDICTMENT AND INFORMATION—LAWFUL ASSEMBLY OF GRAND JURY. —Where, on the reassembling of the grand jury at a special

term, it was discovered that an indictment against defendant had been lost without having been recorded, and the court referred the matter to the grand jury for a new indictment, when four of the grand jurors failed to report, whereupon the court completed the panel by ordering the sheriff to summon  bystanders, and the grand jury so formed returned a new indictment. *Held* that a motion to quash the indictment on the ground that the grand jury was not legally formed or assembled was without merit.

4. Indictment and information — finding new indictment. — Where the grand jury, without attempting to restore a lost indictment, returned a new indictment under Crawford & Moses' Dig., § 3037, the new indictment operated as a suspension of the old indictment.

5. Grand jury—no review of charge to.—There can be no review of alleged errors of the court in its charge to the grand jury, preceding the finding of an indictment.

6. Jury—examination of jurors as to ku klux klan.—Where an offer was made to prove that, on the night of defendant's arrest, men disguised as members of the Ku Klux Klan endeavored to interview defendant, it was error to refuse to permit examination of the trial jurors on their *voir dire* concerning membership in the Ku Klux Klan.

7. Jury—discretion of court as to examination of jurors.—In passing on the question of good faith of attorneys in examining jurors on their *voir dire*, the court is vested with a large amount of discretion, and may interrogate them as to their motive.

8. Witnesses—cross-examination.—On the issue of credibility, it was error to refuse to permit cross-examination of a material witness as to whether he went in disguise to defendant's home on the night he was arrested and tried to interview defendant.

9. Seduction—proof of promise of marriage—evidence.—A promise of marriage in a seduction case cannot be proved by a declaration of the female.

10. Seduction—as between infants.—Seduction is complete as between infants above the age of puberty when the act of sexual intercourse is induced and consummated by reason of a false promise of marriage.

11. Seduction—sufficiency of evidence.—Evidence *held* sufficient to warrant a conviction for seduction.

12. Seduction—defense.—Where, subsequent to an express promise of marriage and while its influence still continued, prosecutrix yielded to sexual intercourse for the purpose of obtaining the consent of defendant's mother to the marriage, *held* that it cannot be said, as a matter of law, that the act was not obtained by virtue of a promise of marriage.

13. SEDUCTION—INSTRUCTION.—A requested instruction that, if prosecutrix yielded to sexual intercourse in order to become pregnant and thus obtain the consent of defendant's mother to the marriage, there would be no unlawful seduction, *held* properly refused.

Appeal from Scott Circuit Court; *John E. Tatum,* Judge; reversed.

*Bates & Duncan* and *Evans & Evans,* for appellant.

*J. S. Utley,* Attorney General, *John L. Carter, Wm. T. Hammock* and *Darden Moose,* Assistants, for appellee.

McCulloch, C. J. The defendant, Justin Bethel, was tried below on an indictment charging him with the crime of seduction, alleged to have been committed by having carnal knowledge of Edna Sliger, an unmarried female, by virtue of a false and feigned express promise of marriage.

It appears from the testimony adduced at the trial that defendant and Edna Sliger, the girl alleged to have been seduced, were each about seventeen years of age—slightly under that age—at the time the alleged promise of marriage and act of sexual intercourse occurred, and that the girl was a few months older than the defendant. It is conceded that the two were "keeping company" with each other for a period of several months, covering the time during which the offense was committed; but defendant, in his testimony, denied that he had engaged himself to marry the girl, or that he ever had sexual intercourse with her. On the other hand, the girl testified that defendant proposed to marry her, that she accepted the proposal, and that the first and numerous succeeding acts of intercourse occurred during the pendency of their agreement to marry. In describing the place, time and circumstances of the act of sexual intercourse, the girl said: "He told me we would never get to marry in any other way unless we did, and let him get me pregnant; he said his mother would not agree to it without we were in that trouble. Q. Would you have surrendered your virtue to him under any other circumstances? A. No sir." It appears from the testimony that at that time defendant's father was dead, and he was

living with his mother. He was a schoolboy, and he and the girl attended the same school; her mother was dead at that time, and she lived with her father.

The State introduced the father of the girl, and other witnesses, to show the ostensible relations between the defendant and the girl, in order to corroborate her statement as to the promise of marriage and acts of sexual intercourse. The girl testified that she became pregnant as a result of her sexual intercourse with defendant, and that she gave birth to a child prior to the trial of this case. She testified that she and defendant became engaged to be married on July 31, 1922; that the first act of sexual intercourse occurred on August 26, 1922, and was frequently repeated from then up to some day during the month of November; that defendant continued to visit her until January, 1923, when he broke his promise of marriage, offered her money to leave the country, and refrained from associating with her any more.

Defendant denied, as before stated, that he promised to marry the girl, or had sexual intercourse with her. He admitted, however, that he visited her frequently during the summer and autumn of 1922, but that he ceased his visits and association with her on Thanksgiving day of that year, on account of her conduct on that day.

The court, in its charge to the jury, gave the following instruction, over defendant's objection:

"3. The court further instructs the jury, if any man against whom a prosecution has begun, either before a justice of the peace or by an indictment by a grand jury, for the crime of seduction, shall marry the female alleged to have been seduced, such prosecution shall not then be terminated, but shall be suspended; provided that if, at any time thereafter, the accused shall wilfully, and without such cause as now constitutes a legal cause for divorce, desert and abandon such female, then at such time said prosecution shall be continued and proceed as

though no marriage had taken place between such female and the accused.''

The bill of exceptions recites that, ''after the instructions of the court and the arguments of counsel, and just immediately before the court instructed the jury as to the form of their verdict, the court stated to the jury that, in view of the arguments of counsel, he deemed it proper to state to the jury that, in the event the jury should convict the defendant, if the defendant would, at any time, marry the prosecuting witness, he would suspend the sentence.''

There was an exception saved to the giving of each of these instructions, and the rulings of the court are assigned as error.

There are numerous other assignments of error to be considered, but, in view of the fact that the Attorney General concedes that a reversal must follow on account of the court's last statement to the jury, unless the act of the General Assembly of 1923 (General Acts 1923, p. 40), authorizing trial courts to suspend criminal sentences, cures the error in these instructions, we deem it proper to consider this assignment first, before disposing of the others.

It is unnecessary to discuss the force and effect or validity of the recent statute just referred to, for we are of the opinion that it has no bearing upon the question whether or not the court erred in charging the jury upon the effect of the statute suspending prosecutions in seduction cases, or in telling the jury, just before the final submission of the cause, that the court would suspend judgment, under the recent statute, if the jury convicted the defendant and he afterwards married the girl. The court set forth the statute (Crawford & Moses' Digest, § 2415) in the instruction quoted above, but it had no application in the trial of the present case, for the reason that there was no contention from any quarter that the defendant had married the girl or offered to marry her, and the sole effect of the statute was to sus-

pend the prosecution, not to authorize the suspension of sentence. We do not think, however, that there was any prejudice in giving instruction No. 3, for it is undisputed that the defendant had not married the girl or offered to marry her. The error in the court's final charge to the jury, however, arose from the fact that it constituted an inducement to the jury to find the defendant guilty by expressing a promise on the part of the court that, if there was a verdict of guilty returned and the defendant married the girl, he would suspend sentence. The court had no right to hold out such a promise to the jury. We have no means of knowing what effect it had upon the jury, but it was calculated to lessen, in the eyes of the jury, the ultimate effect of a verdict of guilty, and might have been part of the inducing cause to bring about the verdict. *Bishop* v. *State,* 73 Ark. 568; *Pittman* v. *State,* 84 Ark. 292; *Bird* v. *State,* 154 Ark. 297. Our conclusion therefore is that the final charge of the court to the jury was erroneous and prejudicial, and that it calls for a reversal of the judgment.

Questions embraced in other assignments of error, which may arise again, will now be discussed and disposed of for the guidance of the court in the next trial.

The record shows that the indictment against the defendant for this offense was returned by the grand jury at the regular August term, 1922, and that there was an adjournment of the court over to September 19, 1922, on which date this cause was set down for trial. The grand jury had not been discharged, but it had adjourned over to that date, or, rather, subject to the call of the court, and the grand jury was ordered to report to the court on that date. It was discovered on that date that the indictment had been lost without having been recorded, and the court, at the request of the prosecuting attorney, referred the matter to the grand jury for a new indictment. Four of the grand jurors failed to report, and the court completed the panel by having the sheriff summon bystanders. There was a

reference to the grand jury, and a new indictment returned. Defendant waived arraignment, and pleaded not guilty, and the trial was proceeded with, resulting, as before stated, in a verdict of guilty being rendered. Without attempting to restore the lost indictment, the grand jury could return another indictment, which, under the statute (Crawford & Moses' Digest, § 3037), operated as a suspension of the old indictment. There was a motion to quash the indictment on the ground that the grand jury was not legally formed or assembled at the time the indictment was returned, but this is fully answered by the foregoing recitals as to what was done. Another ground for quashing the indictment was that the court failed to fully charge the grand jury in resubmitting the matter to the jury, and failed to give correct instructions. There can be no review of alleged errors of the court in its charge to a grand jury preceding the finding of an indictment. The indictment is only an accusation, and if it be returned by a legally constituted grand jury, for obvious reasons there can be no review of errors of the court in its charge. We are therefore of the opinion that there is no merit in these assignments of error.

In the examination of trial jurors on their *voir dire,* counsel for defendant proposed to inquire of each juror whether or not he was a member of the organization known as the Ku Klux Klan, but, objection being made by the prosecuting attorney, the court refused to permit the question to be asked. Counsel then proposed to ask each juror, as he was presented for examination, the same question, but the court refused to permit it to be done. The following colloquy took place between defendant's counsel and the court: "Mr. Evans: I propose to ask each and very one of the jurors the question, and the purpose of the question is to determine, to enable us to determine, what peremptory challenges we will make in this case. It is not cause for challenge itself to be a member of the Klan, but we desire to ask the question

for the purpose of enabling us to determine, with that information, whether or not we will exercise peremptory challenges, and we are entitled to that information in order to determine whether we will challenge a juror or not. I will state this to the court, that it will be proved in this case that on the night, I am informed and believed, that the defendant was arrested in the justice of the peace's court, certain persons came to the defendant's mother's house, where he was, disguised as members of the Ku Klux Klan, and wanted to interview him with reference to this matter, and in that way it brings that question into issue here; and as a matter of precaution, and acting in the utmost good faith, we insist that we are entitled to have that information from each of the jurors called for the purpose stated." The Court: "It is the court's view that a man belonging to the Ku Klux Klan would be no more subject to be challenged than if he belonged to the Masons, the Odd Fellows, or a member of any other order, or a member of Baptist Church, or Methodist or Presbyterian Church; such membership does not disqualify a man as a juror, and the court holds that in this case it is improper and irrelevant to ask the jurors whether or not they are members of the Ku Klux Klan, and the court will not allow counsel to ask that question."

Exceptions were duly saved to this ruling of the court. Counsel for defendant then asked permission to propound the further inquiry to the jurors whether or not they were members of any organization "which is bound, either directly or indirectly, to prosecute or punish any person for alleged crimes against women." The court permitted this question to be asked.

During the progress of the trial defendant offered to prove that, on the night after he was arrested, a small group of masked men went to the home of defendant's mother, where he resided, and wanted to call him out, but that defendant's mother declined to permit him to go out to see the men. Defendant's mother said that she saw one man in the group, and that he was dressed in a

brown coat, or raincoat, and had a black mask over his face. Defendant attempted to impeach one of the State's witnesses by asking him whether or not he was a member of the Ku Klux Klan and was the leader of the group of men who went, masked, to the home of defendant the night he was arrested, and called him out. The court refused to admit this testimony, and also excluded testimony offered by defendant to show that Edna Sliger had endeavored to get several persons to secure the interest and intervention of the Ku Klux Klan, and that her father, W. H. Sliger, proposed to one of the witnesses that they get the Ku Klux Klan at Bates, where all the parties lived, to "handle the case," and that Sliger had said that he would get the Klan at Heavener, Oklahoma, to handle the case, as the Klan at Bates did not "have the guts to do it." Sliger himself denied, on the witness stand, that he had made this statement, and the court refused to permit the introduction of testimony of other witnesses to prove that he made the statement accredited to him by the witness. .

In the case of *Clark* v. *State,* 154 Ark. 592, we decided that "mere membership in committees, or in societies, or other organizations for the suppression of crime, or the achievement of any other particular purpose, does not operate as a disqualification of a juror, unless it is shown that the particular individual has actual bias, or is directly connected with the matter under investigation in a way from which bias or prejudice will be implied," but that an accused has the right, for the purpose of determining the extent to which he will avail himself of the statutory peremptory challenges; to inquire as to the membership of the proposed jurors in an organization "where it is shown that there are reasons why membership in an organization might influence the parties to the litigation in the exercise of peremptory challenges," and that "the court ought to permit the inquiry to be made, if it appears to be made in good faith."

In the more recent case of *Snyder* v. *State,* 160 Ark. 93, we recognized the same rule, but held that

where nothing more was shown than that the trial judge, the prosecuting attorney, the sheriff, deputy sheriff and employed counsel were members of the Ku Klux Klan, an organization of which the accused could not be a member, because of the fact that she was a woman, is not sufficient reason for being permitted to interrogate jurors concerning their membership in said organization. We did not decide in either of those cases that it was necessary for the accused or his attorney to prove the grounds for interrogating the witnesses, but that, on the contrary, if the questions were asked in good faith, and were not merely capricious or impertinent, the court should permit the inquiry to be made, in order for the accused to intelligently and satisfactorily exercise his right of peremptory challenge. In the Clark case, *supra,* we said:

"If there were merely involved an inquiry by the accused as to membership in a particular organization, this alone would not show that the inquiry was material or that prejudice resulted, but, in the present case, appellant's counsel informed the court of the fact that there were certain possible antagonisms between the membership of the organization to which appellant belonged and the one to which the proposed jurors belonged, and he was entitled to ascertain the fact whether or not the jurors were members of the other organization, so that he could determine in what instances he would exercise his rights of peremptory challenge."

In the Snyder case we said that, in order to be entitled to ask such a question, "it should be made to appear that the organization to which the officers and jurors belong, or that the members thereof, were antagonistic to an accused or some organization to which he belongs," but that does not mean that the accused or his attorney must make actual proof before he can be permitted to ask the question. It is, in other words, a question of good faith, and the court necessarily must exercise a large amount of discretion in passing on this question. If the court doubts the good faith or accuracy of the information of the accused or his counsel in pro-

pounding the questions to jurors, the court may inquire further into his motives by interrogating the attorney on the subject, but it is not essential that, as grounds for making the inquiry as to membership of jurors in organizations, proof be first adduced establishing the connection between the proposed juror and the organization, or to introduce proof that there is actual antagonism between the defendant and the organization inquired about. The same question may arise in the lower court in a different form or aspect, and it is unnecessary to determine now whether or not the court would have abused its discretion in holding that the inquiry was not made in good faith, for the court did not pass on that question, but held that the inquiry was not permissible at all. It is true that the court permitted the counsel to ask jurors about membership in any organization for the purpose of punishing crime against women, but this did not reach to the point that defendant sought to bring out from the jurors, that they were members of a particular organization, the Ku Klux Klan, which, counsel informed the court, was taking an interest in this particular prosecution. The inquiry which the court permitted the counsel to make did not in anywise accomplish the same purpose sought in asking about the membership in the particular organization named.

The court erred in refusing to permit the defendant to interrogate witness Raymond Cook, on cross-examination, as to whether or not he was one of the three or four men who went in disguise to defendant's home on the night that he was arrested and tried to take him out and have a talk with him; the court refused to permit the inquiry to be made. Counsel for defendant stated to the court, at the time, that this testimony was sought to be drawn out on cross-examination to show the bias of the witness, but the court refused to permit the testimony to go in. We think this testimony was admissible, and that the court erred in its ruling excluding it. Cook was a material witness, for he testified to circumstances which

tended to corroborate Edna Sliger as to her relations
with the defendant. This was the only means of corrob-
orating the witness, and when the State availed itself
of the opportunity of proving these relations by witness
Cook, it was important to the defendant to discredit him
by showing that he was taking an active interest in the
prosecution, even to the extent of going to the home of
defendant, disguised, with other men, for the purpose
of calling him out and talking with him. The ultimate
purpose of the disguised men in going there, if indeed
they did go there, as declared by the witness, is not shown,
but, if it occurred, it was an unusual incident, and consti-
tuted unjustified conduct on the part of the men, and
if the witness, Cook, joined in such an enterprise, the
defendant was entitled to have the jury consider it in
testing his credibility as a witness.

W. H. Sliger, the father of Edna, was introduced as a
witness for the purpose of corroborating her testimony
as to the promise of marriage. He did not testify to any
act or declaration of defendant which tended to show
a promise of marriage or sexual intercourse, except the
intimate relations between the boy and the girl, covering
a period of two or three months, almost to the exclusion of
other visitors, and the witness was permitted to testify,
over objection of defendant, that his daughter told him
some time in November, 1922, that she and defendant
were engaged to be married. Counsel for defendant
specifically objected to the testimony, on the ground that
it was hearsay, but the court held that statements of
parties to a marriage contract might be proved as an
exception to the general rule against hearsay testimony
or self-serving declarations. In this ruling the court
was clearly in error, for a promise of marriage cannot
be proved by the declaration of the injured party. The
ruling is in direct conflict with the decision of this court in
*Carrens* v. *State,* 77 Ark. 16, and *Woodard* v. *State,* 143
Ark. 404. In the Carrens case we held that the injured
female could not be corroborated merely by her own

letters to the accused, and in the Woodard case, *supra*, we held that neither acts nor declarations of the injured female, in the absence of the defendant, were competent testimony for the purpose of corroborating her as to the promise of marriage.

It is next contended that, as the proof in the case showed that defendant was under seventeen years of age, and legally incapable of entering into the marriage relation without the consent of his parents, the defendant would not be guilty of having sexual intercourse with the girl under a false promise of marriage, unless she was ignorant of the fact that he was under age. The defendant asked instructions to that effect, which the court refused to give, and, on the contrary, told the jury that the fact that the defendant was under age would be no defense to the charge. In the case of *Polk* v. *State,* 40 Ark. 482, this court decided that the fact that the person accused of seduction was below the age at which he could marry, without the consent of his parents or guardian, did not constitute a defense to the charge. The court said: "The offense consists in having illicit connection with an unmarried female, who yields to the solicitations of her seducer under the inducement of a promise of marriage. And it may be committed by an infant upon an infant, provided they have reached the age of puberty." The court did not, in that case, mention any exception to the rule as to knowledge or information on the part of the girl that the accused was under age at the time of the commission of the act. On the contrary, the rule was laid down unqualifiedly that the offense is complete as between infants above the age of puberty, where the act of sexual intercourse is induced and consummated by reason of a false promise of marriage.

Finally, it is insisted that the verdict is contrary to the uncontradicted evidence, in that it is shown by the testimony of the girl herself that the sexual intercourse was not induced by an unconditional promise of marriage. Counsel insist that, when the girl testified that the sole reason why she yielded her virtue to the defend-

ant was his statement that it was necessary for him to have intercourse with her and that she become pregnant as a result, so that his mother would agree for them to marry, this showed that there was no inducement by an unqualified promise of marriage. We cannot agree with counsel in this. The girl testified that there was an express promise of marriage, on a certain day prior to the first act of sexual intercourse, and that the relations established by the agreement to marry extended beyond the first act of sexual intercourse and the frequent acts of intercourse which occurred thereafter. The fact that she finally yielded to the embraces of the defendant solely upon his assurance that it was necessary that she should become pregnant in order to secure the consent of his mother to the marriage did not lessen the unconditional quality of the marriage agreement to which she had testified. It is true that the jury might have found that there was no promise of marriage, or that, if there was a promise of marriage, it was made conditional upon the consent of defendant's mother, and that the sexual intercourse was induced merely as a means of obtaining the consent of defendant's mother. But it cannot be said, as a matter of law, that because, subsequent to the express promise of marriage, and while its influence still continued, the girl yielded to the embraces of her lover for the purpose of obtaining the consent of his mother, the act of intercourse was not obtained by virtue of the promise of marriage. The two things are not at all inconsistent, for the girl may have yielded her virtue because of the promise of marriage and also in order to create conditions which would permit the consummation of the marriage. The case does not therefore fall within the rule announced by this court in decisions cited by counsel to the effect that, when sexual intercourse is obtained by virtue of a conditional promise of marriage if pregnancy resulted, it did not come within the statute. *Taylor* v. *State,* 113 Ark. 520; *Davie* v. *Padgett,* 117 Ark. 544; *Oaks* v. *State,* 135 Ark. 221; *Woodard* v. *State,* 140 Ark. 258. The instructions asked by the defendant,

which would have told the jury that, if the girl yielded in order to become pregnant and thus obtain the consent of defendant's mother to the marriage, it would not constitute unlawful seduction, were erroneous, and were properly refused.

There was, we think, sufficient evidence to warrant the submission of the case to the jury, both as to unconditional promise of marriage and the acts of sexual intercourse which were induced by such promise. The girl testified positively as to those facts, and she was corroborated by proof as to the relations which apparently existed between the parties, as observed by the girl's father and other witnesses, and also there was some corroboration in the statement of defendant to another girl, as testified to by her, after the birth of the child. All of the circumstances made a case for the jury, we think, and the court was correct in refusing to take it away from the jury on a peremptory instruction.

For the errors hereinbefore indicated, however, the judgment is reversed, and the cause remanded for a new trial.