LAUDERDALE *v.* STATE.

4985                                              343 S. W. 2d 422

Opinion delivered February 13, 1961.

[Rehearing denied March 20, 1961]

*Howard & McDaniel,* for appellant.

*Bruce Bennett,* Attorney General; by *Bill J. Davis,* Asst. Attorney General, for appellee.

ED. F. McFADDIN, Associate Justice. Appellant was charged with injuring property with dynamite—a violation of § 41-4237, Ark. Stats. The information stated: "The said E. A. Lauderdale, Sr., on or about the 7th day of September A. D. 1959, did unlawfully and feloniously, and willfully damage and injure a building located at 800 Louisiana Street in the City of Little Rock, by means of dynamite, against the peace and dignity of the State of Arkansas." Although appellant was charged with damaging the school building at Eighth and Louisiana, it was not claimed that he personally set off the

dynamite: rather, the claim was, that he was an accessory before the fact with his accomplice, J. D. Sims, who, personally and in keeping with the directions of Lauderdale, set off the charge of dynamite. An accessory before the fact may be tried and convicted as a principal. Section 41-118, Ark. Stats.; *Wilkerson* v. *State,* 209 Ark. 138, 189 S. W. 2d 800. J. D. Sims confessed to the crime and received sentence and then testified for the State in the trial against Lauderdale.

The trial resulted in a jury verdict of guilty; and from a judgment on the verdict there is this appeal. The transcript contains more than a thousand typewritten pages; the combined abstracts and briefs in this Court contain 537 printed pages; and the motion for new trial contains 55 assignments. We discuss some of these:

I. *Change Of Venue.* Appellant claimed that because of other dynamitings, because of widespread newspaper, television, and radio publicity, and because the Little Rock Chamber of Commerce offered a reward for the conviction of the dynamiters, it was impossible for him to obtain a fair trial in Pulaski County. The motion for change of venue stated in part: "Within a matter of less than a week after the commission of the said crimes, public opinion in Pulaski County became firmly fixed against your petitioner, and the minds of the inhabitants of Pulaski County are now so prejudiced against petitioner that a fair and impartial trial cannot be had in Pulaski County, Arkansas, in this matter."

Both appellant and the State called witnesses in regard to the change of venue; a total of twenty-three testified; and at the conclusion of the hearing the Circuit Court denied the motion. We cannot say that the Trial Court abused its discretion. In *Perry and Coggins* v. *State,* 232 Ark. 959, 342 S. W. 2d 95, there was discussed this matter of the change of venue of two other parties involved in other dynamitings that occurred the same night. In that case, the Trial Court also denied the motion for change of venue and we sustained the ruling: what we said

in that opinion on the change of venue matter applies with equal force to the case at bar.

II. *Refusal To Allow Interrogation Of Veniremen On Certain Matters.* A large number of veniremen were examined before the jury was finally completed. In the course of the *voir dire* examination the defendant's attorney asked many questions, some relating to membership in the Country Club of Little Rock, the Capitol Citizens' Council, the Little Rock Chamber of Commerce, and also membership in churches and other organizations. The defendant undertook to ask the venireman, "Are you a segregationist or an integrationist?" The Court refused to allow any venireman to be asked such question; and the correctness of that ruling is the point here at issue. The appellant says that he had a right to ask the veniremen, "as to whether they believed in integration, the mixing of the races, or segregation"; and appellant cites *Bethell* v. *State,* 162 Ark. 76, 257 S. W. 740, 31 A.L.R. 402, wherein we held it was proper on *voir dire* to ask veniremen if they belonged to the Ku Klux Klan. When relevant and of significance to the case being tried, inquiry should be allowed to be made on *voir dire* as to membership in an organization. The examination of the prospective juror is for the purpose of obtaining a fair and impartial jury, each member of which has a mind free and clear of all interest, bias, or prejudice that might prevent the finding of a true and just verdict. In 31 Am. Jur. 121 "Jury" § 139, the rationale of the holdings is summarized in this language:

"A wide latitude is allowed counsel in examining jurors on their *voir dire.* The scope of inquiry is best governed by a wise and liberal discretion of the Court, but the adverse litigant should be given the right to inquire freely about the interest, direct or indirect, of the proposed juror that may affect his final decision. Thus reasonable latitude should be given parties in the examination of jurors to gain knowledge of their mental attitude toward the issues to be tried. . . ."

The same authority then continues:

"However, as a general rule, the examination of jurors on *voir dire* should be restricted to questions which are pertinent and proper for testing the capacity and competency of the juror . . . and must not go so far beyond the parties and the issues directly involved that it is likely to create a bias, a prejudice, or an unfair attitude toward any litigant."[1]

To ask a venireman on *voir dire* whether he was a segregationist or an integrationist would have no bearing on his fairness as a juror to sit in the trial of a case being tried for dynamiting a building. This is particularly true in this case since the words, "integrationist" and "segregationist" are now relative terms, and convey meanings of a scope and degree of intensity of feelings as to be more confusing than helpful in determining the fitness of a juror. To compel the veniremen to answer questions on these points would have been to inject an issue not pertinent to testing the capacity and competency of the jurors and would have tended to create a bias or prejudice that would also have embarrassed the veniremen. The Judge of the Trial Court is vested with wide discretion in determining the extent to which inquiry may be made of veniremen; and, by seeing the trial, can determine first hand—far better than we can on appeal—whether the questions asked are in good faith or are for the purpose of creating bias and prejudice. We cannot say that the Trial Judge abused his discretion in the case at bar.

III. *The Juror Smith.* The appellant claims that the Trial Court committed error with respect to this juror (a) in preventing appellant from further interrogation of the juror on *voir dire,* and (b) in refusing to excuse the juror because of the answers he made on *voir dire.* However, we find no error committed by the Court in either of these matters. Several pages in the transcript contain the *voir dire* examination of the juror and

---

[1] See also 50 C. J. S. p. 1041, "Juries" § 275. A clear statement of the law is also to be found in *Reed* v. *Commonwealth* (Ky.), 314 S. W. 2d 543.

the Court's rulings. It was not shown that Mr. Smith had discussed the case with any witness; but he did state that he had an opinion in the case. The Court then asked him the following:

"Q. You can and will set this pre-conceived opinion aside and go in the jury box with an open mind and try this case solely on the law and the evidence developed here and give both sides a fair and impartial trial?

A. That's correct."

In response to inquiries by appellant, the juror stated that he would have to hear evidence to feel that his original opinion was erroneous; and again the Court asked the juror:

"Q. You could set that opinion aside and try this case solely on the law and the evidence developed here?

A. Yes, your Honor."

The appellant desired to further interrogate the juror as to whether it would take evidence to remove his opinion, but the Court then ruled that the inquiry had been pursued far enough, and that the juror would not be excused for cause. The appellant had exhausted his peremptory challenges at this point.

The situation presented to the Trial Court was similar to the situation in many of our reported cases. In *Rowe* v. *State,* 224 Ark. 671, 275 S. W. 2d 887, this Court said:

"While it is true that some of the veniremen said that they had formed tentative opinions based upon newspaper reports or what some one had told them, all who were accepted stated that they could and would be guided solely by the testimony, giving to the defendant the benefit of all doubts that the law defines. There was no error in accepting these men. It is no longer practicable in an intelligent society to select jurors from a psychological vacuum or from a stratum where information common to the community as a whole is lacking."

In *Reynolds* v. *United States,* 98 U. S. 145, 25 L. Ed. 244, Chief Justice Waite used this language, which is apropos:

"The reading of the evidence leaves the impression that the juror had some hypothetical opinion about the case, but it falls far short of raising a manifest presumption of partiality. In considering such questions in a reviewing court, we ought not to be unmindful of the fact we have so often observed in our experience, that jurors not unfrequently seek to excuse themselves on the ground of having formed an opinion, when, on examination, it turns out that no real disqualification exists. In such cases the manner of the **juror while** testifying is oftentimes more indicative of the real character of his opinion than his words. That is seen below, but cannot always be spread upon the record. Care should, therefore, be taken in the reviewing court not to reverse the ruling below upon such a question of fact, except in a clear case."

In *Niven* v. *State,* 190 Ark. 514, 80 S. W. 2d 644, Mr. Justice McHaney said:

"Our rule is that a juror is not disqualified in a criminal case where he has a 'fixed' opinion which is based upon hearsay testimony, newspaper reports, or mere rumor, even though it would take evidence to remove such opinion, where he states on his *voir dire* that he can and will, if selected, go into the jury box and disregard such opinion, and that he has no bias or prejudice for or against the accused. *Jackson* v. *State,* 103 Ark. 21, 145 S. W. 559; *Corley* v. *State,* 162 Ark. 178, 257 S. W. 750; *Tisdale* v. *State,* 120 Ark. 470, 179 S. W. 650; *Scruggs* v. *State,* 131 Ark. 320, 198 S. W. 694; *Crawford* v. *State,* 132 Ark. 518, 201 S. W. 784; *Mallory* v. *State,* 141 Ark. 496, 217 S. W. 482; *Sneed* v. *State,* 143 Ark. 178, 219 S. W. 1019; *Borland* v. *State,* 158 Ark. 37, 249 S. W. 591; *Maroney* v. *State,* 177 Ark. 355, 6 S. W. 2d 299. The above cases also hold that the qualifications of a juror rest very largely in the sound discretion of the trial court."

The trial court did not abuse its discretion in the rulings regarding the juror Smith.

IV. *Admission Of Other Dynamitings.* Appellant was tried for participation in the dynamiting of the Little Rock School Board Office. J. D. Sims had confessed to participating in this dynamiting and he testified for the State; also Jesse Raymond Perry had been tried and convicted for participating in this dynamiting, and he testified against appellant. Furthermore, it was shown that the dynamiting of the Little Rock School Board Office was a part of a scheme planned by appellant Lauderdale with Sims, Perry, Coggins and Samuel Graydon Beavers, to dynamite several places the same night the School Board building was dynamited. Appellant claims that error was committed in allowing the testimony as to other dynamiting the same night. He relies very strongly on our holding in *Alford* v. *State,* 223 Ark. 330, 266 S. W. 2d 804, in which this language appears:

"Thus our cases very plainly support the common-sense conclusion that proof of other offenses is competent when it actually sheds light on the defendant's intent; otherwise it must be excluded."

See also *Rhea* v. *State,* 226 Ark. 664, 291 S. W. 2d 521.

We hold that the testimony as to the other dynamitings planned for the same night was clearly admissible to show the scheme, pattern, and intent of Lauderdale in the dynamiting[2] in the case of the Little Rock School Board Office for which he was tried. In the appeal of *Perry and Coggins* v. *State,* 232 Ark. 959, 342 S. W. 2d 95

---

[2] As regards evidence of other dynamitings the Court instructed the jury as follows:

"You are instructed that evidence introduced by the State in this case, of similar offenses and a planned similar offense which was to occur prior to the offense charged in the information, was admitted solely for the purpose of showing the defendant's intent, if any; motive, if any; guilty knowledge, if any; and his part in a common scheme, if any; and you may consider it for this purpose and this purpose only. You may consider such evidence then only if you find beyond a reasonable doubt that similar offenses occurred or another similar offense had been planned and that the defendant participated in the alleged common design. The defendant is not on trial for any offense except the offense charged in the information."

we ruled on this question, involving the same dynamiting incident as herein involved, and we quoted from Underhill On Criminal Evidence, 5th Ed., § 207, as follows:

" 'If several crimes are intermixed, or blended with one another, or connected so that they form an indivisible criminal transaction, and full proof by testimony, whether direct or circumstantial, of any one of them cannot be given without showing the others, evidence of any or all of them is admissible against a defendant on trial for any offense which is itself a detail of the whole criminal scheme.' "

V. *Sufficiency Of The Corroboration.*

Section 43-2116, Ark. Stats. reads in part:

"A conviction cannot be had in any case of felony upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows that the offense was committed, and the circumstances thereof . . ."

The appellant insists that there was not sufficient evidence to take the case to the jury — says appellant — because the testimony of the accomplices was not sufficiently corroborated by other evidence tending to connect Lauderdale with the commission of the offense. The evidence of the accomplices in this case is sufficient to support the jury verdict *if there be other testimony independent of the testimony of the accomplices that tends to connect defendant* with the commission of the crime.[3] We therefore have examined the record for such "other testimony"; and here is some of it:

---

[3] Some of our cases on corroboration of accomplices presenting a jury question are *Miller* v. *State*, 155 Ark. 68, 243 S. W. 1063; *Knight and Johnson* v. *State*, 228 Ark. 502, 308 S. W. 2d 821; *Underwood* v. *State*, 205 Ark. 864, 171 S. W. 2d 304; and *Vaughn* v. *State*, 58 Ark. 353, 24 S. W. 885. At the request of the defendant, the Court instructed the jury as follows:

"You were told that under the law of the State of Arkansas, the defendant, E. A. Lauderdale, cannot be convicted upon the testimony of the accomplices, J. D. Sims, Jessie Perry, and Samuel Graydon Beavers, unless you find that the testimony of said accomplices is corroborated by other evidence tending to connect Ed Lauderdale with the commission of the offense; and the corroboration is not sufficient

(1) It was testified by the witness Rucker that about 6:30 P. M. on the night of Monday, Sepbember 7, 1959 (the night of the dynamiting) he was burning trash and heard a car door slam a short distance away; that he investigated and found the appellant Lauderdale, who said he had been getting leaf mold; and that after a brief conversation about their families, Lauderdale **drove** away. The witness Rucker testified that Lauderdale was alone and sitting in the car, and that it was parked in a clean place where there was no leaf mold. Three days after the bombing, officers went with Rucker to the place where he had seen Lauderdale; and a cache of dynamite was found 150 feet from where Lauderdale's car had been parked. It was shown by other witnesses that this cache consisted of 65 sticks of dynamite, and a coil fuse over 19 feet long — all in a sack under a pile of rusted metal.

(2) It was testified by Sammy Beavers, son of Samuel Graydon Beavers, that appellant Lauderdale visited at the home of Samuel Graydon Beavers and had a 15-minute conversation with Samuel Graydon Beavers (one of the accomplices) outside of the hearing of any person, on Friday night before the Labor Day bombings on the following Monday. Lauderdale came at six o'clock in the evening and professed to be in a hurry, but he took Samuel Graydon Beavers (the accomplice) out on the front porch and they talked from 15 to 30 minutes, with no one hearing the conversation.

(3) The accomplice Beavers testified that he obtained dynamite and fuse from Lauderdale to use in bombing another place in Little Rock, but the witness changed his mind and decided it was too dangerous; so he took the dynamite and fuse home and buried them. He took the officers to the place where he had buried the items; and the officers testified that the dynamite and fuse that Beavers had were similar to some of the dyna-

---

if it merely shows that the offense was committed, and the circumstances thereof. In other words, the rule is that the evidence, independent of that of the accomplice, must tend to connect the defendant with the commission of the crime."

mite and fuse that had been uncovered in the cache previously mentioned.

(4) The witness Crawley testified that she was the owner and operator of the King Tut Cafe on Asher Avenue, and that about 7:30 P. M. on Labor Day, September 7, 1959, Sims drove up to her cafe with another man seated on the front seat with him and with Lauderdale on the back seat. She waited on the three men and brought them three cups of coffee and one package of cigarettes. This testimony put Lauderdale with Sims three hours before the dynamiting.

(5) It was testified by two FBI agents that the fingerprint of appellant was found on the car of Perry, the accomplice. This testimony put Lauderdale and Perry together in a car some time before the bombing.

(6) Perry and Sims claimed that they met Lauderdale at 13th and Pine Streets one evening to make the plans for the bombing. The law enforcement officers testified that Lauderdale admitted to them that he was at 13th and Pine on the same evening that Perry and Sims claimed to have met him there.

The testimony of some of these witnesses was disputed, but the weighing of the testimony was for the jury; and our problem is, whether these six numbered items constitute "other evidence tending to connect the defendant with the commission of the offense," independent of the testimony of the accomplices. One of these items if standing alone would not be sufficient; two of them might not be sufficient; but when all six of these items are put together, we hold that they are sufficient "other evidence tending to connect the defendant with the commission of the offense"; independent of the testimony of the accomplices. Together they make a chain of circumstances that carry the case to the jury. One thread, in itself, is very weak, but many threads woven together will make a rope; and these threads of independent evidence, woven together, are sufficient to take the case to the jury.

VI. *The Juror Illing.* The trial of this case commenced in Circuit Court on November 23, 1959, and the jury verdict was returned late in the night of November 27, 1959. On the afternoon of November 27th, just as the defense was presenting its last witness before resting the case, the following occurred at the instance of the defendant in the absence of the jury:

"Mr. Howard: If Your Honor, please, since the jury was selected and sworn, there has come to the attention of counsel for the defendant that one of the jurors, Mr. Horace Illing, is related by affinity to Fire Chief Nalley, whose automobile was the subject of testimony in this law suit, and it being our information, and it is purely information, that Fire Chief Nalley married the sister of Horace Illing, and we ask the Court to declare a mistrial at this time.

"The Court: That is what I understand. I learned that yesterday. Overruled.

"The defendant objected to the above ruling of the court and at the time asked that his exceptions be noted of record, which was accordingly done."

Appellant claims that the Court's ruling was erroneous and that the Court should have declared a mistrial because of Juror Illing's relationship to the wife of Fire Chief Nalley. We do not agree with the appellant's claim; and there are several reasons for our conclusion.

In the first place, there was no statutory reason for excusing the juror Illing. Section 43-1920, Ark. Stats., in listing the grounds for challenging a juror for implied bias, says in part:

"First. Where the juror is related by consanguinity, or affinity, or stands in the relation of guardian and ward, attorney and client, master and servant, landlord and tenant, employer and employed on wages, or is a member of the family of defendant or of the person alleged to be injured by the offense charged, or on whose complaint the prosecution was instituted."

Illing could not have been disqualified under this section because Lauderdale was being tried only for dynamiting the school office and not for dynamiting the automobile which the Little Rock Fire Department owned and had assigned to Fire Chief Nalley, who did not own the car and could have suffered no property damage in connection with the dynamiting of the car. Furthermore, Nalley was not even a witness[4] in the trial of this case. The Trial Court possesses considerable discretion as to excusing jurors in a situation such as is here presented, and we cannot say that such discretion was abused.[5]

Another reason for our conclusion to sustain the ruling of the Trial Court in regard to Juror Illing is because of the opportunity the appellant had on *voir dire* examination to interrogate Juror Illing. The *voir dire* examination of Illing consumed eight pages of the typewritten transcript (T. 408-415, inclusive). The juror was interrogated by the defendant at length, and that was the time and place for the defendant to ask him about any possible relationship to anyone in any wise the object of any bombing. Due diligence required investigation by the defendant on *voir dire* as to veniremen; and defendant could not wait until near the conclusion of the trial, then ask the Court for a mistrial, and complain that the Court abused its discretion. No "overruling

---

[4] In *Jones* v. *State*, 230 Ark. 18, 320 S. W. 2d 645, we held that a juror was not disqualified as a matter of law even when related to a witness in a case.

[5] Appellant cited the Texas Appeals case of *Wright* v. *State*, 12 Tex. App. 163, decided in 1882. In that case it was held that a juror was disqualified because his family had a horse alleged to have been stolen by the defendant then on trial for stealing a horse from another party. No cases or authorities were cited to sustain the Court; and the holding is considerably weakened by the subsequent Texas case of *Rogers* v. *State*, 109 Tex. Cr. R. 88, 3 S. W. 2d 455, decided by the Texas Court of Criminal Appeals (the highest court in criminal cases) in 1927. In the Rogers case the Court held that a juror was not absolutely disqualified because of relationship to the prosecutrix, and then the Court said: "We find in many opinions expressions regarding disqualifications of jurors or incompetence of jurors which are inaccurate to say the least." The Court also cited, *inter alia, Wright* v. *State*, 12 Tex. App. 163, and said: "Said cases present facts only partly similar to those before us, and, in so far as the opinions advanced the suggestion that jurors were incompetent or disqualified, same are not accurate."

necessity" was shown in this case, nor any absolute statutory disqualification or bias.

*Conclusion.* As aforesaid, the motion for a new trial contained fifty-five assignments. We have studied each one of them and find no reversible error.

Affirmed.

GEORGE ROSE SMITH, ROBINSON and JOHNSON, JJ., dissent.

SAM ROBINSON, Associate Justice, dissenting. There are three serious errors in this case, any one of which calls for a reversal of the judgment if the appellant is not to be denied a fair and impartial trial. And, regardless of the nature of the crime charged, or whether he is guilty or innocent, under our Constitution and laws he is entitled to be tried by a fair and impartial jury. Ark. Const. of 1874, Art. 2, §§ 7-10. *Glasser* v. *U. S.,* 315 U. S. 60, 86 L. Ed. 680, 62 S. Ct. 457.

The errors mentioned are: (1) The refusal of the trial court to declare a mistrial after learning that Chief Gann Nalley's brother-in-law, Horace Illing, was a member of the jury; (2) the action of the trial court in refusing to allow defense counsel to question the veniremen on their voir dire examination as to their feelings with reference to integration or segregation of the races; (3) the action of the trial court in refusing to permit counsel for the defendant to question the venireman Smith as to how he arrived at an opinion as to the guilt or innocence of the defendant after it developed on his examination in chief that he did have such an opinion as would require evidence to remove.

We will deal with the errors in the order named. First, the refusal of the trial court to declare a mistrial after learning that a member of the jury was a brother-in-law to Chief of the Fire Department Nalley, whose automobile was destroyed with dynamite, which offense was so closely connected with the dynamiting of the school building that the two crimes constituted a part of the same transaction. The defendant was on trial for

having participated in the bombing of a school building at 8th and Louisiana Streets in Little Rock. A short time before the bombing of the school building, Fire Chief Gann Nalley's automobile, furnished to him by the Fire Department, while parked at his home, was destroyed with dynamite. During the trial of the case the State was permitted to prove the bombing of Chief Nalley's car. In these circumstances it cannot be said that Chief Nalley and his wife would have been qualified jurors. Undoubtedly by reason of their close connection with the case, Nalley and his wife, Horace Illing's sister, would have been disqualified. In fact, they were disqualified by statute. Ark. Stats., § 43-1920 provides: "A challenge for implied bias may be taken: First. Where the juror is related by consanguinity, or affinity, or stands in the relation of guardian and ward, attorney and client, master and servant, landlord and tenant, employer and employed on wages, or is a member of the family of defendant or of the person alleged to be injured by the offense charged, or on whose complaint the prosecution was instituted."

Here Chief Nalley and his wife, the juror's sister, were injured, at least in a nominal manner, by the offense proven in this case to convict the defendant. The dynamite was exploded in their yard, blowing up an automobile in the possession and control of Chief Nalley. Fortunately, he and his wife, the juror's sister, were not in the car at the time.

On the motion for a change of venue, numerous newspaper articles were introduced in evidence, referring to the dynamiting of the car. It is stated in one of the local papers of September 12, 1959: "The charges accuse each of these three with two offenses: The dynamiting of Fire Chief Gann L. Nalley's city-owned station wagon, at Nalley's home Monday night, and the dynamiting of the Little Rock School Board office at Louisiana Street." Another article of September 9th states: "The police and the F. B. I. continued checking at the other two scenes of the bombings, the Baldwin Company at 322

Gaines Street, which houses the business office of Mayor Werner C. Knoop, and the home of Fire Chief Gann L. Nalley at 5221 Base Line Road, where a city-owned station wagon was blown up.'' An article of September 12th states: ''Two charges were filed in circuit court against Lauderdale, Sims and Perry. They are accused of dynamiting Nalley's car and the school administration building.'' Another article of September 8th states that Lauderdale and Sims are charged with the school board building bombing at 800 Louisiana and the Fire Chief's vehicle. It can be assumed that Nalley complained of the dynamiting of his car. Hence, not only were he and his wife the injured parties within the meaning of the above mentioned statute, but they must have been two of the complaining parties. It will be recalled, now, that the defendant was on trial for dynamiting the school building. The State was permitted to prove the dynamiting of Nalley's car, and Nalley's wife's brother was on the jury.

Nalley and his wife were disqualified as jurors, and under the statute the wife's brother, the juror Illing, was also disqualified. He was closely related by consanguinity and affinity to the injured and complaining parties. The fact that it was not shown that Nalley and his wife went to the prosecuting attorney and filed a complaint is immaterial. In the circumstances they would be considered complaining parties within the meaning of the statute even if they had asked that the cases be dismissed. But even if Nalley and his wife should not be regarded as parties in the case at bar, they are parties in a similar case that would disqualify them in the present case. The courts have always been zealous to protect a party's right to a fair and impartial trial, and even where it was learned after a trial was completed that the trial judge was a distant relative of the wife of the deceased in a murder case, the defendant was granted a new trial on that ground alone. *Byler* v. *State,* 210 Ark. 790, 197 S. W. 2d 748. If the trial judge is disqualified in a situation of that kind, a juror would be even more disqualified. A juror has much more to do with whether a defendant is convicted than does a trial judge.

In the Byler case it was held that the murdered man's wife was a party to the case, and the trial judge was disqualified to try the case because he was her second cousin. Here the juror Illing's sister, a much closer relationship than that of a second cousin, was one of the injured parties. Dynamite was exploded in her yard, thereby destroying an automobile and endangering her life, and this offense was proved in the trial as going to show the defendant's guilt. In the *Byler* case Judge Frank Smith said: ''He [the trial judge] never thought about the deceased sheriff being a relative of his wife, as they had no social relations and the deceased had not voted for him when he was elected to office. It may be said also that the judge presided not only with ability, but with absolute impartiality. It may be asked, therefore, what difference it makes that this relationship existed between the presiding judge and the sheriff? The answer is, ' 'Twill be recorded for a precedent and many an error by the same example will rush into the State. It cannot be.' ''

In 31 Am. Jur. 17, it is said: ''The right to a jury trial embraces the right to a proper jury.'' And in *State* v. *Emery,* 224 N.C. 581, 31 S. E. 2d 858, the court said: ''It is clear, therefore, that the law not only guarantees the right of trial by jury, but also the right of trial by a proper jury.'' In *Hartford Bank* v. *Hart,* 3 Day 491, the court held that a juror who had married the sister of a party in another case, depending on the same principles as the one on trial, was properly excused from sitting on the jury, though his wife was then dead. In *Ledford* v. *Georgia,* 75 Ga. 856, the court said: ''The juror was disqualified, being a third cousin and within the ninth degree, which fact was unknown to the defendant and his counsel till after the trial . . . The principle on which the law rejects him is that he is not impartial; the same objection lies to his assertion that he was ignorant of the relationship at the time of the trial, after he had assisted in the conviction.''

*Wright* v. *State,* 12 Tex. App. 163, is closely in point with the case at bar. There the defendant was charged

by separate indictments with stealing a number of horses belonging to different owners. There the court said: "Under these circumstances, although in the present case but one person is charged to have been injured by the commission of the offense charged in the indictment, we are of opinion that in the interest of a fair and impartial trial it was error for the court to hold a juror competent who was related within the prohibited degree to any of the persons injured by the offense against all, though the offense was charged by different indictments. In our opinion the defendant was deprived of a fair and impartial trial when there was forced upon him . . . a son of an injured party and brother-in-law to another, in cases involving to some extent at least proof of the same facts necessary to the conviction of the defendant."

There the situation was exactly as it is in the case at bar, and the court held that a brother-in-law was disqualified as a juror. The majority attempt to show that the *Wright* case has been impaired by the later decision of the Texas court in the case of *Rogers* v. *State,* 109 Tex. Cr. R. 88, 3 S. W. 2d 455. A reading of the *Rogers* case will show that the *Wright* decision has not been impaired to any extent whatever.

The juror Illing being disqualified, the next question which arises is, did the defense waive the disqualification by not discovering Illing's relationship to the parties on the voir dire examination'? There was no waiver. True, defendant's counsel did not ascertain on voir dire examination the relationship between Illing and the Nalleys, but of course Illing was fully conscious of the relationship and he knew that the defendant was charged with exploding dynamite in his sister's yard and blowing up an automobile in possession of his brother-in-law. He should have volunteered the information. Regardless of how fair-minded Illing might be, it would be utterly impossible for him to be *impartial* in the circumstances, and the defendant was entitled to be tried by an impartial jury. We are not without precedent in a situation of this kind. We have two cases directly in point. In *McDaniel*

v. *State*, 228 Ark. 1122, 313 S. W. 2d 77, this Court held that the trial court properly discharged a juror after the jury was sworn, because he was related to the defendant. Such relationship had not been discovered on the voir dire examination, and this Court did not indicate that the State waived such disqualification by reason of the failure to learn of the relationship earlier. The Court cited *Harris* v. *State*, 177 Ark. 186, 6 S. W. 2d 34, where it was held that the trial court properly discharged a juror after evidence had been introduced in the case because the juror was on the defendant's bond. These cases show conclusively that the mere fact that the relationship was not discovered on the voir dire is no sound reason for not remedying the situation when the discovery is made.

To sustain the view expressed by the majority, only the case of *Jones* v. *State*, 230 Ark. 18, 320 S. W. 2d 645, is cited, and that case is not in point. There a juror was discharged over the objection of the defendant. There was no contention that the juror was related by consanguinity or affinity to a member of the family of the person alleged to have been injured by the offense charged or on whose complaint the prosecution was instituted. The juror in the Jones case was merely a sister to a policeman who was a witness for the State. If anyone had a right to object to the sister of the policeman serving as a juror, it would have been the defendant, and he made no objection whatever. In fact, he objected to the juror's being discharged.

Next is the matter of the trial court's refusing to permit counsel for defendant to question venireman in regard to their feelings about integration of the schools. It is a matter of common knowledge that the dynamiting of the school building grew out of the integration of the schools controversy in Little Rock. In addition, the State introduced testimony to that effect. The State's witness, Sims, who blew up the Nalley car, testified that the dynamiting was done for the purpose of harassing the public and keeping the Negroes out of the white schools. There are people who firmly believe that the schools should be integrated; on the other hand, others are

firmly convinced that the schools should not be integrated. The situation in Little Rock has been such as to arouse the emotions of many people. Undoubtedly the dynamiting of the school building was calculated to prevent integration. In these circumstances the attorney for the defendant would want to know how a juror felt on the subject of integration. In all probability he would exercise a peremptory challenge on a venireman who strongly favored integration. But the court would not permit the veniremen to be questioned on how they felt on that subject. Again the majority have not cited a single authority that sustains the view expressed. The majority quote from 31 Am. Jur. 121. Instead of sustaining the majority, it is clear that the cited text is favorable to the contention made by appellant. As heretofore pointed out, it was of the utmost importance for defense counsel to know how the jurors felt on the integration question, but he was denied the right of getting this information from the veniremen. The majority state: ''When relevant and of significance to the case being tried, inquiry should be allowed to be made on voir dire as to membership in an organization.'' But the majority do not follow this principle and do not point out in what way a venireman's convictions on the integration question would be immaterial when a person is charged with a very serious crime committed in an attempt to prevent integration, as proved by the State. In *Bethel* v. *State,* 162 Ark. 76, 257 S. W. 740, Judge McCulloch said: '' . . . an accused has a right, for the purpose of determining the extent to which he will avail himself of the statutory peremptory challenges, to inquire as to the membership of the proposed jurors in an organization 'where it is shown that there are reasons why membership in an organization might influence the parties to the litigation in the exercise of peremptory challenges,' and 'that the court ought to permit the inquiry to be made, if it appears to be made in good faith.' ''

In the case at bar the State proved that the defendant committed a crime in an attempt to prevent

integration of the schools. The defense attorney might have been extremely negligent if he had failed to attempt to learn how a venireman felt about integration. The situation is likened to a case where a person is charged with bootlegging liquor. Certainly defense counsel should be permitted to inquire if a venireman is a prohibitionist. In the case of *Pendergrass* v. *State,* 121 Tex. Cr. R. 213, 48 S. W. 2d 997, the charge was "illegally transporting liquor," and, although the defendant did not make his record properly, the court said: "It would have been proper for appellant's counsel to elicit from each juror whether or not he was a prohibitionist, in order that he might intelligently exercise his peremptory challenges. (Citing cases.) The right to appear by counsel, guaranteed by the Bill of Rights, carries with it the right of counsel, within reasonable limits, to examine each juror individually in order to prepare himself for the intelligent exercise of the peremptory challenges allowed him by statute." (Citing cases.)

In 50 C. J. S. p 1043, it is said: "With the exception of such questions as the juror may be privileged from answering on the ground that the answer would tend to degrade or incriminate him . . . a juror may be fully examined and asked any questions which are pertinent to show the existence of bias or prejudice, and may be examined as to any bias with respect to the nature of the case or the subject matter of the litigation as well as with respect to the parties personally." And in 50 C. J. S. p. 1036, it is said: "The right to a trial by a fair and impartial jury includes the right to have the jurors sworn and examined as to their qualifications, and it is error for the court to deny this right if properly requested before the jury is sworn. This right may be exercised by either party to a civil or criminal action, and exists with respect to each particular case regardless of the fact that the same jurors have been examined in other cases. The purpose of voir dire examination is to determine whether a juror possesses the necessary qualifications, whether he has prejudged the case, and whether his mind is free from prejudice and bias, so as to enable

the party to ascertain whether a cause for challenge exists, and to ascertain whether it is expedient to exercise the right of peremptory challenge, . . ."

The next point is the refusal of the trial court to permit defense counsel to continue the examination of the venireman Smith after he had stated he had an opinion as to the guilt or innocence of the accused which would require evidence to remove. The majority state: "It was not shown that Smith had discussed the case with any witness." Neither does the record show that he had not discussed the case with witnesses. Mr. Smith stated frankly and unequivocally that he had an opinion as to the guilt or innocence of the defendant and that it would take evidence to remove such opinion, but on further questioning by the court he stated that he could give the defendant a fair and impartial trial. The defense attorney then attempted to question Smith further about his opinion, but the court ruled that no further questions along that line would be permitted. The majority state that the court "ruled that . . . the juror would not be excused for cause," and then a long line of cases is cited to the effect that the mere fact a venireman has an opinion based on newspaper reports or rumor does not disqualify him. Appellant makes no contention that such is not the law, but appellant does say that when the venireman stated that he had an opinion based on what he had "seen, read and heard," he was prima facie disqualified and that he remained disqualified until it is shown by further questioning that what he had seen, read and heard was only newspaper items or rumors and that he had not actually been a witness to the commission of the crime and had not talked to witnesses who purported to know the facts in the case.

The State made no effort to show how Mr. Smith arrived at the opinion which he stated he had as to the merits of the case, and the defendant was not allowed to fully develop the facts on that point. The Court said, in *Sneed* v. *State,* 47 Ark. 180, 1 S. W. 68: "The entertainment of preconceived notions about the merits of a criminal case renders a juror prima facie incompetent.

But when it is shown that the impression is founded upon rumor, and not of a nature to influence his conduct, the disqualification is removed.'' To the same effect is *Hardin* v. *State,* 66 Ark. 53, 48 S. W. 904. In the case at bar the disqualification was never removed.

For the reasons stated herein, I respectfully dissent.

GEORGE ROSE SMITH, J., joins in that part of this dissent pertaining to the juror Illing.

JOHNSON, J., joins in this dissent.

JIM JOHNSON, Associate Justice, dissenting. I agree with every word of Mr. Justice Robinson's dissenting opinion in this case and in addition to the reasoning thereof I would also reverse because of the refusal of the trial court to grant defendant's Petition for Change of Venue.

I recognize that where a Petition for Change of Venue is controverted by the State and controverting evidence is offered, it is a matter of the court's sound discretion as to whether the petition should be granted. *Leggett* v. *State,* 227 Ark. 393, 299 S. W. 2d 59. On the other hand, this does not mean that the court may arbitrarily deny such a petition merely because it is controverted or merely because there is controverting evidence produced. I am firmly convinced that in denying this petition the trial court misconstrued the rule of the *Leggett* case, *supra,* and abused his discretion. Apparently, the trial court felt that the *Leggett* case held that if prospective jurors, examined before the petition is heard, do not disqualify, the petition should be denied. It should be noted that over the protest of the appellant, and before evidence was taken on his Petition for Change of Venue, the trial court had the Clerk call the 27 jurors left on the panel of 50 and the court asked three general questions of this group. These questions were whether any member of the panel knew of any reason why he should not serve on the jury in the case and whether what the members of the panel had seen, read and heard about the crime would prevent them from giving both the

State and the defendant a fair and impartial trial. Some of the panel answered "No, sir" and the court asked one other question requesting any member of the jury who had his mind made up to so indicate. This question was not answered. As previously indicated, this was done over the protest of the appellant and when he did not have an opportunity to interrogate said jurors, even though he told the court that he had 40 or 50 questions to be addressed to every member of the panel. The court's erroneous misconception of the holding of the *Leggett* case becomes even more demonstrable by a reference to the record wherein the oral statement of the court denying defendant's Petition for Change of Venue is set forth verbatim. In denying this petition, the court made it abundantly clear that he based his ruling wholly and solely upon the answers of the jurors to the three questions heretofore set forth *and that he had not considered the evidence which was adduced in support of and in opposition to the Petition for Change of Venue.* I do not believe that the holding of the *Leggett* case may be so simplified. In the *Leggett* case, the Petition for Change of Venue was filed on the 3rd day of the trial supported by the affidavits and testimony of two witnesses. One of these witnesses knew little about the sentiment in the county except that prevailing in two wards in Little Rock. It cannot be said that this made even a *prima facie* showing as it is necessary that at least two of the affiants or witnesses know the state of mind of the inhabitants of the whole county. *Brown* v. *State,* 134 Ark. 597, 203 S. W. 1031. The court held in the *Brown* case that if a witness was not acquainted with the sentiment over the county generally, the trial court was at liberty to find that he was not a "credible person" as required by the statute. Further, at the time of the hearing in the *Leggett* case, eleven jurors had already been chosen, and this Court said on appeal:

"Here the trial judge had listened for more than three days while hundreds of veniremen were searchingly examined under oath. In deciding whether the appellant's two witnesses had correctly estimated the local

sentiment, the court was entitled to consider the view of scores of citizens already heard. Although many venire-men had reached positive conclusions from what they had read or heard, there is no indication that the news reports were biased or represented a studied effort to inflame the public. *Meyer* v. *State,* 218 Ark. 440, 236 S. W. 2d 996. Despite the defendant's theory that it was impossible to obtain a fair-minded jury within the county, the court was convinced by testimony heard at first hand that this goal had almost been reached. In these circumstances the conclusion that the asserted prejudice did not exist lay well within the limits of the court's discretionary authority.''

The facts in the case at bar and those in the *Leggett* case are completely different. Where the appellant Leggett did not have two ''credible'' witnesses on his petition, appellant here had three witnesses who met the test of the statute together with several others who corroborated these witnesses as to particular sections of the county. Appellant's three witnesses were the Hon. Dan Sprick, State Senator of Pulaski County, a former Mayor and Alderman of the City of Little Rock; Mr. Noble Strait, a competitor of the appellant; and Mr. R. C. Limerick, Jr. I will not take space to identify all of the supporting witnesses; suffice it to say, their testimony may be found in the record. There is another striking difference between the *Leggett* case and the case at bar in that the court said in the *Leggett* case that there appeared to be no studied effort on the part of news reports to inflame the public. In this case, the trial judge himself said: ''I will take judicial knowledge that the Gazette is a pro-integration newspaper.'' On the hearing on the petition, 93 news articles, pictures, cartoons and editorials from the two Little Rock newspapers were offered in evidence. I say that those articles, pictures, cartoons and editorials did represent ''a studied effort to inflame the public''. It cannot be said that cartoons on the editorial pages bearing such captions as ''Wanted — Public Enemy No. 1''; ''Triumph of Law and Order''; and ''Tall in the Saddle'' were not studied

efforts to inflame the public against this appellant. There were editorials bearing such captions as "Fast Work in the Bombing Case" wherein it was asserted that the leaders moved with great speed and determination to *"track down the guilty parties"* and those who underwrote a reward fund of $25,000 for arrest and conviction were commended; editorials captioned "The Performance of Little Rock's Finest" wherein the news organ commended "swift decisive work of the Little Rock Police and the Federal Bureau of Investigation" together with the diabolically clever suggestion (intended to warp the public's mind as to the burden of proof in a criminal case) to the effect that the defendants would receive a fair trial; *"with ample opportunity to clear themselves if they are innocent;"* editorials captioned *"fog" suggesting that the defendants were communists and that they should be checked out on this score by the F. B. I.*; and editorials captioned *"An act of terror — and its roots"* wherein it was suggested that the only redress for the damage done: "lies in what we now do — in our clear demonstrations that we will no longer tolerate apostles of discord, the preachers of dissention and the advocates of rebellion who have brought this shame upon our city." These cartoons and these editorials represented studied efforts to inflame the public and to preclude appellant from receiving a fair trial. The action of the Prosecuting Attorney in publicly stating that defendant's $50,000 bond should not be reduced and that: "this defendant has largely forfeited his right in organized society" can hardly be viewed as an effort to assure to the appellant a fair trial by unbiased jurors. In fact, in *Sisson* v. *State,* 168 Ark. 783, 272 S. W. 674, it was held that where a sheriff had, in his campaign for election, made speeches over the county wherein he stated that he was going to send the defendant "to hell or the penitentiary one, if he was elected sheriff" was such as to create prejudice in the minds of the inhabitants of the county against the defendant and furnished full justification for the belief of an affiant that the minds of the inhabitants of the county had been prejudiced against the appellant. The record shows that Mr. Holt was three

times honored with the office of Prosecuting Attorney by the very people from whom prospective jurors would be selected. The actions of the Pulaski County Bar Association in adopting resolutions condemning participants in acts of terrorism and commending the law enforcement officers for their activities; contributing to the Chamber of Commerce reward fund and advising the law enforcement officers and the officials of the county that: "This Association, upon request, will assist in any way possible in the investigation of the said explosion or the prosecution of persons charged with responsibility therefor" were certainly not calculated to insure a fair trial to appellant. Lawyers are leaders in the community and when a whole county bar association arrays itself on the side of the prosecution before trial and without fee or hope of reward offers to prosecute the persons charged with the crimes, it cannot help but engrave an impression upon the minds of the public to the effect that those charged are guilty. When business and professional leaders in the community are quoted in the press as condemning the crimes in question, it cannot be said that such statements do not work grave damage to the cause of a defendant awaiting trial on such charges. When the President of the Little Rock Council of P. T. A. says: "I think the penalty should be a stiff, severe one"; such a statement cannot be said to be creating an atmosphere of sweetness and light for a trial of the charges. When the District Superintendent of the Methodist Church and the Episcopal Bishop of Arkansas condemn the acts in public news stories and the Bishop calls for: "A common effort to guard the safety of every man, woman and child who inhabits the city", how can it be said that these news stories would not work for the conviction of the defendant as surely as the testimony of an eye witness?

When it is shown that these statements of condemnation by community leaders were published in one newspaper with an average circulation of 45,683 in the county of venue and another newspaper with a circulation of 44,000 in the county of venue and it is further shown that the same matters were given publicity by television and

radio, I respectfully submit that such publicity cannot be said to have no effect upon the minds of prospective jurors. This was not an ordinary case where a juror may have read one or two newspaper articles. This was a situation where there had been incessant publicity from the very beginning. When the business manager of the Arkansas Gazette said: "We have run more than one editorial with respect to acts of terrorism and have even offered cartoons and we are quite proud of the orbit of accounts. We hope that people will form an opinion from what we say," it certainly cannot be said that the news reports, cartoon pictures, and editorials in that publication were not a studied effort to inflame the public. When the Chamber of Commerce can quickly raise $25,000 to prosecute the persons charged with the crime, it can hardly be said that the contributors to such fund are indifferent.

Regardless of the guilt or innocence of a person or persons being tried for the commission of a crime, basic concepts of our system of justice demand that every defendant receive a fair trial by a fair and impartial jury. I sincerely fear that the opinion of the majority in the case at bar holding that those things pointed out by Mr. Justice Robinson, and the results of the conduct of prominent persons and newspapers, as set out above, do not constitute error, has effectively deprived this defendant and by precedent all citizens of this State of the precious right of a fair trial by a fair and impartial jury. For these reasons I cannot conscientiously do less than dissent to the opinion of the majority with all the vigor at my command.