**GLOBAL COMMERCE CORPORATION, S.A., Plaintiff-Appellant,**

v.

**CLARK–BABBITT INDUSTRIES, Inc., Defendant-Appellee.**

No. 13, Docket 23975.

United States Court of Appeals Second Circuit.

Argued Oct. 10 and 11, 1956.

Decided Dec. 17, 1956.

Walter Herzfeld, New York City, Sereni & Herzfeld, New York City, for plaintiff-appellant, Bernard J. Wald, Brooklyn, N. Y., of counsel.

Francis A. Brick, Jr., New York City, Donovan Leisure Newton & Irvine, New York City, for defendant-appellee, Douglas V. Lewis, New York City, of counsel.

Before CLARK, Chief Judge, and HAND and SWAN, Circuit Judges.

HAND, Circuit Judge.

The plaintiff appeals from a judgment dismissing its complaint in an action upon two counts, tried to a judge without a jury. The first count was on a contract for a sale by the defendant to the plaintiff in Mexico of 10,000 tons of copra; the second count was for a commission to the plaintiff for procuring a buyer in Mexico for 5,000 tons of "steel bars." The defendant denied that the parties had ever come to a final agreement as to the terms of either contract; and pleaded as defences to the copra count (1) that the contract was invalid under the Statute of Frauds, and (2) that the defendant was prevented by law from performing it; and as defences to the "steel bars" count, (1) that the contract was invalid under the law of Mexico, where the plaintiff's authority was to be executed, and (2) that the plaintiff had never produced a buyer.

The plaintiff did a general importing business in Mexico City, and in September, 1946, read an advertisement of a New York corporation of

which the manager was one Meyers, to whom it mailed an inquiry, in response to which Meyers offered 3,000 tons of steel bars a month for three months (later reduced to a total of 5,000) at a price of 100 to 105 dollars a ton, including plaintiff's commission of two and one-half per cent. Five days later, on the 16th, the plaintiff received from Meyers a second wire offering 10,000 tons of copra "monthly," at stated prices, which the defendant confirmed by letter on the same day. This letter did not, however, reach the plaintiff until the 20th, and meanwhile Meyers and Klein, the plaintiff's manager, had exchanged several telegrams and had talked on the telephone. The plaintiff insists that by the defendant's letter of September 16 it recognized Meyers's authority to act for it because the letter did not advise it of any limitation upon Meyers's apparent authority. Be that as it may, certainly after September 18 the plaintiff understood that Meyers had no such authority, for in a letter answering the defendant's letter of the 16th, Klein said that "Meyers has informed the writer during the telephone conversation of the day of September 18th, that he is acting for your company as export consultant, and that we will have to deal with you." Moreover, even though the defendant's letter of the 16th had not reached Klein before the 18th and they had already come to an agreement, it would not have bound the defendant, because, not only did Meyers have no authority in fact, but Klein had no warrant for assuming that he did have.

Coming then to the details of the exceedingly ill-defined interchanges between the parties, Meyers's wire of the 16th which the defendant confirmed in its letter of the same day contained no mention of a "performance bond," but Klein testified that on the 18th in his telephone talk with Meyers, the question had come up of such a bond, and Klein had said that he "had in mind" the "usual five percent" bond. Meyers had answered him that he was then in Thomas's office and, after leaving the tel-

ephone, he had come back and said that Thomas agreed to such a bond provided that Klein was in a position to buy the 10,000 tons of copra "right away." This testimony as to Thomas's assent was indeed hearsay, but it was not objected to on that score, and, if believed, it would have supported a finding that a contract had been made on that day,—the 18th. Furthermore, Klein also testified that he had a telephone talk with Thomas himself on the 21st, in which, when he mentioned a 10% performance bond, Thomas had replied that "the agreement was for 5 percent." On the other hand, at that same interview Klein had said to Thomas that the reason why it was urgent for him to speak to Thomas was that he was asking for something else than what had been agreed upon. He did so because his "customer's" directors had asked their manager to try to get a 10% bond instead of a 5%. Thomas answered that his bank was averse to giving any bond whatever and asked him not to insist upon one. The question of a bond came up again in a talk on the 22nd, and Klein then agreed to a five percent bond, but Thomas refused to give any bond at all. On the 23rd Klein wired that his customers insisted upon a bond and that letters of credit would be "immediately opened simultaneously with agreed upon performance bond." Meyers countered on the 24th by a wire, saying that the "unjustifiable and unwarranted request for performance bond makes it impossible to continue discussion. Airmail letter follows." The carbon copy of the letter dated the same day, which Judge Bondy held to have put an end to the negotiation, was probably this letter; but it is not necessary to find that the plaintiff ever received it, because nothing could be a more definitive termination of negotiations than Meyers's wire that we have just quoted, provided that in this instance the defendant had given him authority.

If the record had stopped there, we might perhaps have had to assume that Judge Bondy considered Klein's testimony, and that it had not convinced him;

and in that event we should scarcely have been justified in holding his finding "clearly erroneous" that the parties had never come to an agreement at all. However, the negotiations did not come to an end with the wire of the 24th, or the "airmail letter," if it was received, because, on the 25th Klein wired the defendant that he insisted upon the sale and would open a letter of credit "without bond." He also talked to Thomas on the same day who, having received the wire, told Klein that he was very glad to learn that letters of credit would be opened without any bond at all, and that in the meantime the difficulties which they had had regarding copra and steel bars had been overcome and deliveries would be made without further delay. At Thomas's invitation he came to New York on the 28th and had a personal interview with Thomas, in which Thomas agreed to deliver the copra on the terms already agreed upon including elimination of the bond. Correspondence followed between the parties after Klein's return to Mexico, but it is not necessary to consider it.

■ Judge Bondy apparently disregarded all the evidence of what occurred after September 24, because the "plaintiff does not contend that there was any offer or acceptance made after this date." If, however, the record, when extended to include what took place after the 24th, would support a finding that the parties came to an agreement before Klein went back to Mexico City on the 30th, it would be immaterial that the defendant had previously broken off all negotiations. Whatever may have been the plaintiff's position before Judge Bondy, it is certainly not true that in this court it relies only upon the negotiations before September 25th. It had amended the third article of its complaint to read that "subsequent to the execution of the aforesaid agreement, plaintiff waived the performance by defendant of the latter's obligation thereunder to post a 5% performance bond." Literally, it was indeed one thing to allege that a contract had been made requiring a bond, and that the plaintiff had later surrendered that part of the stipulated consideration; and it was another thing to allege that the original contract did not include any bond; but the variance was wholly immaterial, and we disregard it. We hold, therefore, that there was evidence in this record on which the court might have found that the parties did come to an agreement after September 25, for the sale of copra without any bond, even if there had been no agreement before. Moreover, on the new trial the court will consider all the evidence presented without regard to any finding made upon the first trial.

■■ Next as to the affirmative defence to the copra count of the New York Statute of Frauds. Whether the parties came to a final agreement on or before September 30, 1946, either in the telephone talks and wires between Klein and Thomas, or in their interviews while Klein was in New York, the Mexican law will govern as to the creation and validity of the contract. This follows from the decision of the Court of Appeals in Auten v. Auten, 308 N.Y. 155, 124 N.E. 2d 99, which explicitly accepted what was apparently an already existing change in the earlier doctrine that the validity of a contract depends on the law of the place where the parties make their agreement. We must accept the substituted concept as authoritative; and, so far as we can gather, the test appears to be (1) what is the "center of gravity" of the facts, or (2) which jurisdiction "has the most significant contacts with the matter in dispute," or (3) which is "most intimately concerned with the outcome of [the] particular litigation," or (4) "whether one rule or the other produces the best practical result." Whatever the latitude accorded us by these tests, if we have read them aright under each of them the Mexican law would be the measure of the validity of this contract. Judge Bondy's finding that the plaintiff had not proved the Mexican law was an inadvertence, for it called a witness, whose competence was conceded, and who swore that that law required no writing

to sustain a contract except in the sale of real estate. Upon the new trial the defendant will of course be free to put on witnesses to challenge this testimony; but, unless it does so, the defence of the Statute of Frauds will fail.

 The defence of impossibility of performance is based upon the premise that in the autumn of 1946 the only source of copra available to the defendant was the Philippines; and that it was not possible to obtain delivery except by means of a license issued under War Food Order No. 63 of the War Food Administrator, which had been in force since November 13, 1944 (9 Fed.Reg. 13280), and which prohibited its import (including import for transshipment) save by written leave of the Administrator. The defendant called a witness who swore that "as administered in the fall of 1946" the order "prohibited the direct shipment of copra from the Philippines" except as allocated by the International Emergency Food Council; and that the allocation "for October through December" was 12,000 tons for Mexico. When the defendant filed an application "in early October" for an allotment of 10,-000 tons, he—as "administrator of War Food Order 63"—had denied it because the allotment was exhausted. We will not on this record try to foreclose consideration of this defence beyond the following instructions. The defendant must first prove that no copra was available to fill the contract except that coming from the Philippines. It must also prove that it did not have time enough after the contract was made to get a license before the allotted quota was taken up. If it succeeds in proving both these issues, it will have made good the defence of impossibility of performance, because performance was prevented by a "rule, regulation, or order, issued" under subsection 2(a) of § 633 of Title 50 U.S. C.A.Appendix. The Kronprinzessin Cecilie, 244 U.S. 12, 37 S.Ct. 490, 61 L.Ed. 960; L. N. Jackson & Co. v. Royal Norwegian Government, 2 Cir., 177 F.2d 694.

The count for broker's commission on producing a buyer for the steel bars, requires little added comment. The formation of that contract depended upon the same evidence as that which will determine the formation of the copra contract, for the negotiations as to each were conducted together. The defences of the Statute of Frauds and of impossibility of performance do not apply to this count; but the defendant does invoke the Mexican law to show the invalidity of a contract to retain the plaintiff as its agent to sell the bars. It appears that under that law "a power of attorney must be executed in a notarial instrument or in a private letter signed before two witnesses" and the signatures officially ratified, "when the interest of the business for which it is granted reaches 5,000 pesos or exceeds that sum." On its face this law would appear to apply only to the formalities necessary to a grant of authority to the agent to make his act the act of the principal, and not to cover the validity of the contract to retain the agent. If that is its scope, although the plaintiff would, we assume, have had to procure such a document from the defendant before it could have passed title to the bars, it was not essential as between the parties to the validity of the contract of employment. Upon the new trial it will be open to the defendant to prove, if it can, that this law extended also to a contract of employment, but upon this record the defence was not proved.

 Finally, although Judge Bondy held that "the plaintiff did not establish that he" (sic) "produced a buyer ready, willing and able," he conditioned this finding by saying that, if "it ever did have such a customer, defendant was not informed until some time after these negotiations were terminated by the defendant." Since we are holding that the negotiations did not come to an end on September 24 or 25, and that a contract may have been made without provisions for a bond, this language did not effect a defence. There was evidence to sustain a finding that a buyer was produced at some time before September 30th.

Judgment reversed, cause remanded for a new trial in accordance with the foregoing opinion.