CALDARERA *v.* GILES.

5-2729                                              360 S. W. 2d 767

Opinion delivered September 24, 1962.

[Rehearing denied October 29, 1962.]

*Keith, Clegg & Eckert, Wright, Lindsey, Jennings, Lester & Shults,* for appellant.

*Harry Crumpler* and *Brown & Compton,* for appellee.

NEILL BOHLINGER, Associate Justice. This case arose out of a collision of two trucks, one belonging to the appellants and the other owned by one of the appellees. The suit for damages growing out of the collision of the two trucks was tried before the Columbia Circuit Court,

the appellees seeking damages on account of negligence alleged against the defendants, appellees here, and the appellants counterclaiming for damages which it was alleged had been suffered because of the negligence of the appellee and his driver, Johnny Hight.

The trial resulted in a verdict for the appellees and the appellants prosecute their appeal here alleging as points for reversal (1) the lower court erred in granting appellees' request for a drawn jury after *voir dire* and the exercise of peremptory challenge by the appellants, (2) the misconduct of a jury which it is alleged affected the appellants' right to receive a fair trial and, (3) the amounts of the verdict were excessive.

These facts were developed in the trial: At the beginning of this trial there were 18 veniremen in the jury box and counsel for both plaintiff and defendant were furnished a list of the names of the jurors; after examination on *voir dire,* the appellants struck the names of three of the prospective jurors and returned the list to the clerk. It does not appear that appellants' challenges were revealed to any person and without exercising their peremptory challenge, the appellees moved for a drawn jury which motion was granted over the objection of the appellants. The applicable statute is as follows:

"Ark. Stat. 39-229. Peremptory challenges—Panel drawn upon request—Right to strike names.—Each party shall have three (3) peremptory challenges, which may be made orally—but if either party shall desire a panel, the court shall cause the names of twenty-four (24) competent jurors, written upon separate slips of paper, to be placed in a box to be kept for that purpose, from which the names of eighteen (18) shall be drawn and entered on a list in the order in which they were drawn, and numbered. Each party shall be furnished with a copy of said list, from which each may strike the names of three (3) jurors and return the list so struck to the judge, who shall strike from the original list the names so stricken from the copies, and the first twelve names remaining on said original list shall constitute the jury."

We see no error in allowing a drawn jury at this time as any exercise of challenges on original veniremen was not known. This was a matter which presented itself to the discretion of the trial judge and we do not find that he abused that discretion.

The appellants filed a timely motion for a new trial and in support of that motion presented testimony tending to show that one of the jurors, Otis Franks, Jr., had an interest in the result of the verdict.

It appears, from the record, that the juror, Otis Franks, Jr., was an employee of the First National Bank of Magnolia where he was employed as note teller and worked on relief; that in 1959 he, together with his wife, and Dixon Barnett, and his wife, organized a corporation known as the Bruce Cartright Livestock Auction, Inc.; that some time prior to June 25, 1959, the appellee, Giles, was indebted to the juror's corporation and to discharge that debt the appellee procured a loan from the bank at which Mr. Franks was employed, the loan being in the sum of $3,060.00, and to secure that loan the juror had signed a writing guaranteeing its payment; that the note was a demand note and had not been paid at the time of the trial. As additional security for payment of the demand note, the appellee had executed to the bank an assignment of the proceeds of any recovery which he might secure in this action against the Caldareras.

The name of Mr. Franks does not appear to have been among the eighteen (18) prospective jurors first presented, although his name was on the list that the clerk distributed for the drawn jury.

On examination of the propective jurors the veniremen were asked as to business relationships with the appellee, Mr. Giles; juror Franks answered that Giles had worked for him at the auction barn a couple of years before and since then he had had other business relations with him but that there was nothing in their relations that would affect his verdict.

On behalf of the appellee it is urged that a member of one of the law firms representing the appellants had

drawn the incorporation papers for the juror Franks' corporation and was at the time representing the corporation in a law suit; that this attorney also was a director of the bank that was carrying the loan of Mr. Giles and was a member of the Discount Board and there was introduced a transcript of the meeting of the Discount Committee on June 25, 1959 which discloses that loans and discounts No. 71582 through 71602 to 71612 were before that Board and that a notation appears on that transcript, ''J. F. Giles (letter of guaranty) $3,060.00''; that this particular attorney had participated in the trial, which statement was qualified by the statement of the attorney and other counsel that this particular counsel came in after the trial had started and sat in the back of the courtroom until he was motioned to the counsel table and that when the attorney who was examining the veniremen asked as to Franks, this attorney had said, ''He's a good man.''

The juror, Franks, stated when testifying in the motion for a new trial that his corporation had been the beneficiary of the Giles loan from the bank and that he had signed the agreement guaranteeing the loan and had as his protection a mortgage on the Giles' home; that he knew at the time that he was present on the jury that the original loan had not been paid and that if the appellee, Giles, got a judgment that the $3,060.00 would be thus paid; and on the morning of the trial he had talked to the presiding judge and had told him that appellee Giles had a guaranteed loan at the bank where he worked and the judge had told him to talk to the attorneys and he did talk to the appellees' attorneys but it does not appear that he advised anyone of his guaranty agreement or any assignment of the verdict in this case.

On the *voir dire* examination of the prospective jurors there appears to be no official transcript, but it is established that the court had directed a question to the prospective jurors as to any business dealings with the appellees; that the juror Franks at that time stated that Giles, the appellee, had worked for him two or three years before.

It is the contention of the appellants that the juror Franks had such an interest in the verdict that he was disqualified from serving as a juror; that this disqualification was known to Franks and not to them.

On the other hand, the appellees contend that if Franks had an interest in the proceeds from the verdict that fact was known or could have been known to the attorneys for the appellants and that they failed to avail themselves of the information which was theirs and that it is too late to bring that matter to the attention of the court in a motion for a new trial.

There is a duty upon every prospective juror on *voir dire* examination to make a full and frank disclosure of any connection he may have with the litigants or anything that would or could in any way affect his verdict as a juror. In this case Mr. Franks was asked if he had had any business connection with appellee Giles. His answer was that Giles had worked for him several years before and he had had other dealings with him. In his testimony on the motion for a *rehearing* he used the expression, in connection with his other dealings, ''I did not see any point in saying that I bought two shabby calves from him since 1959.'' There seems to have been more of an effort at evasion than of disclosure. At no point in the empaneling of the jury do we find that Franks told the judge or any of the attorneys with whom he talked, and certainly he did not on *voir dire* state that he was a guarantor of the repayment of a loan which appellee Giles had at the bank where juror Franks was employed and that appellee's judgment in this case was assigned to protect juror's guaranty. Had he done so it must be readily assumed that he would have been disqualified at that time.

We do not know why, when the juror stated he had had other dealings with the appellee, the matter was not pursued further. The revelation as to his dealings at that point had been minor and of no consequence and as to whether or not counsel might have gone further in his examination, we do not say, but certain it is that the juror,

Franks, knew of his own interest in the verdict and that knowledge was shared by the appellee, Giles.

It is true that the record before us reflects that an attorney connected with one of the firms representing appellees was a director of the bank where juror Franks was employed; he was also on the Discount Committee; that on June 25, 1959 the attorney had signed a form which reflected that a number of loans, listed by number and not by name, had been before the Discount Committee and the form contains the statement, "J. F. Giles (letter of guaranty) $3,060.00," but no witness brings home to the attorney involved a knowledge that Mr. Franks was the guarantor on the Giles note and that knowledge must be traced to the attorney before this point has weight. The testimony of the attorney is to the effect that his firm was one of the attorneys for the bank and he was a director and on the Loan and Discount Committee; that the Discount Committee went through certain formalities, made a report that certain members of the committee would sign; that he had no recollection of the loan made by the bank to Mr. Giles, the appellee. That transaction seems to have been dated over a year before the trial.

The loan was a routine one and when asked about it, the president and another officer of the bank did not recall it. Therefore, it is logical to believe the testimony that the matter was not in the mind of the attorney on the morning of the trial. This particular attorney was not trying the case and came into the courtroom after the trial had started. If this attorney had prepared the corporation papers for the juror Franks' company, and was representing that corporation in a law suit, there is nothing that traces to this attorney or any member of his firm any knowledge that juror Franks was a guarantor of the debt of Giles.

Let it be understood that nothing in this opinion is designed to reflect upon counsel. Counsel for both appellants and appellees are able, skillful attorneys and have the confidence of the courts.

It is urged that counsel for appellants should have pursued his interrogation of Franks to uncover "other business dealings," but it does not take a searching cross-examination by counsel nor solemn charge from the bench to advise any man that he cannot sit upon a jury when he has a direct interest in the verdict which he is called upon to formulate.

In the case of *Hot Springs Street Railway Co.* v. *Adams,* 216 Ark. 506, 226 S. W. 2d 354, we had a case in which, as a grounds for reversal, it was alleged that one of the jurors were represented by one of the attorneys for the plaintiff. There the juror said he had not mentioned it because he thought the case had been settled and upon the question being asked of the panel he had held up his hand but that defendant's lawyer did not ask him any questions. In reversing that case we said:

"We believe that the trial court's failure to declare a mistrial was an abuse of discretion constituting reversible error. Even if we accept Calloway's statement that he held up his hand, it is perfectly clear that he knew his gesture had not attracted the attention of appellant's counsel. Both his action in raising his hand and his assertion that he thought his case had been settled show beyond any doubt that he understood the inquiry that was being put. The appellant was entitled to the information sought, as a basis for a peremptory challenge if not as a ground for challenging for cause. In these circumstances the juror's duty of candor extends well beyond a ready acquiescence in the supposition that counsel has decided not to pursue his inquiry. *The very theory of an impartial jury trial demands that the juror take positive action to bring his possible disqualification out into the open when the question is raised.* 'Nothing can destroy the integrity of juries more effectively than to allow prejudiced jurors to sit in a case.' *Anderson* v. *State,* 200 Ark. 516, 139 S. W. 2d 396. For us to approve the denial of a mistrial in this case would, we think, be a disservice to our system of jury trials." [Emphasis added]

The case of *Gershner* v. *Scott-Mayer Comm. Co.*, 93 Ark. 301, 124 S. W. 772, was a case in which the disqualification of a juror by reason of his interest in the result of the trial was before the court. In that case we said:

"Another ground set forth in the motion for new trial is that C. K. Lincoln, one of the trial jurors, was interested in the result of the trial, in that he was an officer and stockholder in a corporation which was a creditor of Gershner & Rosenthal at the time. Plaintiff filed a response, setting forth that it had no information until the motion for new trial was filed that the corporation named was a creditor of Gershner & Rosenthal; and also filed the affidavit of juror Lincoln stating that when he was selected as a juror, and during his service as such, he did not recall to mind the fact that his corporation was a creditor. No questions were asked the juror as to his interest in the outcome of the trial, and no diligence is shown to have been exercised by defendant in ascertaining whether or not the juror was interested. His son and son-in-law, Nathan Gershner and I. E. Rosenthal the two confessed members of the firm, were present at the trial, and knew, not only that the corporation named was a creditor of the firm, but also that juror Lincoln was interested in the corporation.

Though a juror asserts that his direct interest in the result of the trial will not influence his judgment, the law presumes him to be under a disqualifying bias, and public policy forbids that he sit as a juror, notwithstanding his avowal."

In the above case the court refused to set aside the verdict but the facts in the *Gershner* case, *supra,* are far different from those in the case at bar. In the *Gershner* case the most that can be said is that the Gershner partnership was indebted to juror Lincoln's company and had the verdict been for Gershner, we will assume that the Gershner assets would have been increased by $400.00 which might have been a factor in the payment of the Lincoln Company account. But in the *Gershner* case, the jury, of which Lincoln was a member, found against Gershner. The finding was directly against the interest

of juror Lincoln, if any interest he had. Juror Lincoln stated he did not know of the account between his firm and the Gershner partnership and the finding of the jury, being against the juror's interest, precluded any possibility of any intended fraud or wrongdoing or collusion. Hence the trial court properly refused to set the verdict aside.

In the instant case, it is certain that a wrong was done and while the juror stated that his direct interest in the result of the trial would not influence his judgment, not only does the law presume him to be under a disqualifying bias, but public policy forbids that he sit as a juror, notwithstanding his avowal.

One of the greatest rights of citizenship is jury service. Like any other right, it carries responsibilities. One of those responsibilities is to make known anything that affects the right to serve. The opportunity is given to do that in every trial. It was given in this trial and the juror knew what it was for when the question was asked as to dealings with the appellees and he reported some inconsequential contacts several years before and ''other dealings.'' Elaborating on ''other dealings'' in his testimony on the motion for a retrial, he stated that he had bought a couple of shabby calves from Giles. Nowhere did the juror state what he knew to be a fact, that his interest in this verdict was that $3,060.00 of the verdict was assigned to relieve him of his guarantee for the appellee's loan.

The juror should have known that his interest in the proceeds from the verdict in this case would prevent him from serving and failed to make that disqualification known. Being disqualified there is nothing that counsel or trial judge can say or do, or fail to say or do, that can replace that disqualification with the right to serve.

Since there was nothing on which appellants could predicate a supposition that juror Franks was a guarantor for appellee Giles, it readily becomes apparent that counsel would indeed have to have gone far into the realm of speculation to assume that relationship and interro-

gated about it. There was nothing in the case up to that time to indicate it.

In timely and proper manner appellants presented this matter to the court and moved for a new trial. This motion should have been granted and failure to do so was error for which this cause is now reversed and remanded.

HARRIS, C.J. concurs.

McFADDIN, J. dissents.

CARLETON HARRIS, Chief Justice (Concurring). The Opinion of the Court has pointed out that Mr. Franks seemed to have made more of an effort at evasion than disclosure in answering the questions relative to his business connections with appellee Giles. I agree that his statement on the motion for a new trial, ''I did not see any point in saying that I bought two shabby calves from him since 1959'', indicates that he had not intended to mention, on *voir dire* examination, that he was a guarantor of the loan which Giles had at the bank. It also appears that nothing was said to Court or counsel by the juror to the effect that he had guaranteed appellee's note, which, after all, was the principal, and most pertinent, fact that should have been disclosed. However, my vote to reverse this case is not necessarily based upon any feeling of wilful misconduct on the part of Franks, or any belief that there was collusion between Franks and Giles. I am willing to accept the Circuit Court's statement that Mr. Franks stands well in the county and is a ''good'' man. Nonetheless, as a matter of public policy, I do not feel that one should sit as a juror where a pecuniary interest appears, irrespective of whether such interest will affect the juror's judgment. We have had several cases involving disqualification of jurors but I have found no instance of this Court approving the service of a juror in any case where an apparent pecuniary interest was present. To permit one to serve on a jury, where it appears from the record that he *could* be financially interested in the outcome of the case, would, in my opinion, stagger the confidence of the public in our juries and, in fact, strike at the very heart of the jury system.

Ed. F. McFADDIN, Associate Justice (Dissenting). The Majority is reversing the judgment on the ground that the juror, Otis Franks, Jr., was guilty of misconduct; and I dissent. As I see it, neither the facts nor the law support the conclusion reached by the Majority.

## THE FACTS

The record shows that Otis Franks, Jr. is a young business man in Magnolia; that his parents have lived in Columbia County for over sixty years; that he works in the First National Bank of Magnolia; that some time before the trial he had become a guarantor on the note of James Floyd Giles to the First National Bank of Magnolia; that Mr. Eckert, one of the attorneys for the appellant in this case, was on the Discount Committee of the Bank; that Mr. Eckert had been the attorney of Mr. Otis Franks, Jr.; and that Mr. Eckert had drawn an instrument whereby Giles assigned to the Bank any recovery in this case. When Mr. Franks went to the court house, summoned as a juror in the case, he went to Judge Jones, the presiding Judge, and told him that Floyd Giles had a guaranteed loan at the Bank, and that he (Franks) worked at the Bank. Judge Jones told Franks to tell the lawyers about it. Mr. Franks went to one of the lawyers, who told him: ''You answer whatever questions that are put to you by the Court and the attorneys''. When Franks was questioned on *voir dire,* he told the Court and the attorneys that Giles had worked for him in the auction barn for a couple of years, and since then they had other business dealings. Here is his undisputed testimony as to what occurred on *voir dire*:

''Q. The question has arisen about a certain question asked by either the court or the attorneys about any business dealings you had with one of the plaintiffs, Floyd Giles,—will you tell the court what your answer was to the question as to your business relations with Mr. Giles?

''A. When they asked the question I answered that he had worked for me in the auction barn for a couple of years and since then we have had other business deals.

"Q. Were you asked any further questions about that by the attorneys or the court?

"A. No, sir."

Mr. Franks also testified that he was asked on *voir dire* if his business dealings with Giles would influence his verdict, and that he answered that they would not; and that such answer was true.

Mr. Eckert entered the court room while the jury was being interrogated, and the trial attorney for the appellant went to Mr. Eckert and asked him what about Franks as a juror, and Mr. Eckert replied, "He is a fine boy". The Circuit Judge, in refusing to set aside the verdict on account of the alleged misconduct of Otis Franks, Jr., said:

". . . I don't agree with the complaining persons in this case. But in this case I am sorry about it on account of the gentleman that to some extent has been made a goat out of: Mr. Franks. I know him and know his father, and they are good people, and I feel that both attorneys for the plaintiffs and the Defendants feel the same as I do about that . . .

"Mr. Franks' testimony here today as to what was asked him was almost word for word what I remember was asked. He said the Plaintiff, Mr. Giles, had worked for him and that they had had other business deals. It was dropped at that point, no question was asked what that business was or what it consisted of, and everybody seemed to be perfectly satisfied, and I think under the circumstances that the attorneys for the Defendants were put on notice sufficiently by his statement that if they had cared to they could have pursued it further. I do say that it is my personal opinion from the whole set-up, everything that happened in this case, knowing Mr. Franks and knowing how he stands in this county, had everything been known that is known here now he would still have served on this jury. So I don't know that the Defendant is in too much of a position to complain for that reason.

"But there is another matter—it is an undisputed fact in this case that the attorneys for the defendants were in a very close relationship with the juror. This had

existed over a long period of time. I don't mean regular employment but matters had arisen between them, and the juror had gone to one of the attorneys for advice. It is undisputed in this case that one of the attorneys was on the Discount Committee at the bank, that he knew Mr. Franks was with the bank and he knew Mr. Giles was indebted to the bank. It is a matter of common knowledge, that usually there is some kind of endorsement or guaranty drawn to secure money to the bank for money owed them. So I say if the Defendants' lawyers did not know that in this case, that everything else concerning that loan they did know, and I say that their knowledge was sufficinet in this case that they are not now in a position to complain of it.

''The motion for new trial will be over-ruled . . .''

The Trial Court was in a far better position than is this Court to determine, under the facts, whether Otis Franks, Jr. was guilty of misconduct. The Court found that he was not: rather, the Court found that the attorneys for the appellants did not pursue the matter with diligence[1] and, therefore, could not be heard to complain after they had lost the case. They thought that Otis Franks ''was a good boy''; they chanced having him on the jury; and after they lost the case they wanted to call back the play and make Otis Franks the ''goat''. I think the appellant has ''sinned away his day of grace'' on this question of the misconduct of the juror, Otis Franks, under the facts in this case.

## THE LAW

We held in *Hot Springs Street Ry. Co.* v. *Adams*, 216 Ark. 506, 226 S. W. 2d 354, that the juror Calloway had failed to make a complete disclosure; but that is not the situation here. Otis Franks went to the Court, and he told

---

[1] In 39 Am. Jur. 86, "New Trial" § 71, the holdings are summarized:
"It is a well-settled general rule that where alleged misconduct of the jury was known to the party claiming to have been prejudiced thereby, or to his counsel, during the trial and before a verdict was rendered, and no objection was made thereto and the matter was not in any manner brought to the attention of the court, such party cannot, after an adverse verdict, assert the misconduct as a ground for a new trial."

the attorneys, so the Hot Springs Street Railway case is not applicable. The other case cited by the Majority is that of *Gershner* v. *Scott-Mayer Comm. Co.,* 93 Ark. 301, 124 S. W. 772. In that case the juror, C. K. Lincoln, was an officer and a stockholder in a corporation that was a creditor of Gershner. Lincoln did not recall that fact to his mind when he was selected as a juror. "No questions were asked the juror as to his interest in the outcome of the trial, and no diligence is shown to have been exercised by defendant in ascertaining whether or not the juror was interested." Under that situation this Court held that the person seeking to set the verdict aside had not been diligent, and we said:

"But when objection is made to a juror after the verdict for the first time, due diligence to discover the disqualification must be shown by the objecting party. At that stage of the case it becomes to some extent a matter of discretion with the trial court as to whether or not the verdict shall be set aside; and when there is no fraud intended or wrong done or collusion on the part of the successful party, it is not reversible error for the trial court to refuse to set aside the verdict. *Fain* v. *Goodwin,* 35 Ark. 109, *Shinn* v. *Tucker,* 37 Ark. 580."

In the case at bar there was no fraud intended, and certainly there was no collusion on the part of the successful party with the juror Franks; and, therfore, the Gershner case affords the Majority no support for its conclusion. Rather, the Gershner case indicates that when there is an absence of fraud or an absence of proof of collusion on the part of the successful party, then the Trial Court's discretion in refusing to set aside the verdict will not be overthrown by us.

In *Lauderdale* v. *State,* 233 Ark. 96, 343 S. W. 2d 422, the appellant urged on appeal that the Trial Court committed error in failing to excuse Juror Illing. We held that the appellant had failed to show due diligence; and what we said in that case certainly applies here:

"Another reason for our conclusion to sustain the ruling of the Trial Court in regard to Juror Illing is be-

cause of the opportunity the appellant had on *voir dire* examination to interrogate Juror Illing. The *voir dire* examination of Illing consumed eight pages of the type-written transcript (T. 408-415, inclusive). The juror was interrogated by the defendant at length, and that was the time and place for the defendant to ask him about any possible relationship to anyone in any wise the object of any bombing. Due diligence required investigation by the defendant on *voir dire* as to veniremen; and defendant could not wait until near the conclusion of the trial, then ask the Court for a mistrial, and complain that the Court abused its discretion.''

In 39 Am. Jur. 87, ''New Trial'' § 73, in discussing the discretion of the trial court, the holdings are summarized:

''The refusal or denial of a motion for a new trial for alleged misconduct on the part of the jury is, as a general rule, a matter within the discretion of the judge presiding at the trial; and unless it appears that this discretion has been abused, that there has been palpable error, or that the judge has refused to review and consider the evidence by which the consideration of the motion should have been guided or controlled, his refusal to grant a new trial will not be disturbed. In considering the motion, 'each application must be determined mainly upon its own peculiar facts and circumstances and should be granted or refused with a view not so much to the attainment of exact justice in a particular case as to the ultimate effect of the decision upon the administration of justice in general.'

''Many authorities may be cited to support the rule that where a motion for a new trial is based on the alleged misconduct of a juror or jurors, and the trial judge hears evidence, either orally or by affidavits, touching such misconduct, his conclusions of fact on conflicting statements will not be disturbed on appeal.''

For the reasons herein stated, I respectfully dissent.