Robert THRELKELD and Sammy Grisham
d/b/a T & G Cattle Company *v.* Don WORSHAM
and Mike Statler

CA 89-185                                      785 S.W.2d 249

Court of Appeals of Arkansas
Division I
Opinion delivered March 14, 1990

*W. Swain Perkins*; and *Sullivan, Emmons & Kissee*, by: *Larry Dean Kissee*, for .appellants.

*J. Scott Davidson & H. David Blair*; and *Jim Short*, for appellees.

MELVIN MAYFIELD, Judge. The appellees in this case, Don Worsham and Mike Statler, are residents of Arkansas. They filed separate lawsuits against appellants for breach of express and implied warranties, the selling of unreasonably dangerous cattle in a defective condition, and for knowingly bring in (or causing to be brought) diseased cattle into the state of Arkansas. The cases were consolidated for trial. Appellants, who are residents of Missouri, argued that Missouri law controlled the implied warranty issue. Before trial, appellants filed a motion to strike appellees' claims for damages for breach of implied warranty,

because under Missouri law, a written warranty was necessary to maintain such a claim involving livestock. The trial judge denied this motion. At trial, appellants again argued that Missouri law controlled on the implied warranty issue. This objection was overruled, and the jury was instructed on the law of Arkansas. The case was submitted on interrogatories covering the separate theories of implied warranty, strict products liability, and statutory liability. The answer to each interrogatory was favorable to the appellees, and judgments were entered for them in the amounts found by the jury.

■ On appeal, appellants argue that: (1) the trial court erred in not applying Missouri law to each of the theories relied upon by the appellees, and (2) that the trial court erred in denying appellants' challenge to a juror for cause. With regard to the theory of strict liability for supplying cattle in a defective condition which rendered them unreasonably dangerous, and the statutory liability under Ark. Code Ann. Section 2-40-101(c) for bringing, or causing to be brought, cattle into Arkansas knowing them to be suffering from a contagious or infectious disease, the appellees correctly point out that the appellants have failed to preserve objections for appeal on these theories. Appellants did object to the giving of instructions using Arkansas law on the implied warranty theory but made no such objection to the application of Arkansas law to the other claims, and we do not consider arguments on appeal if they were not raised in the trial court. *Ark. Burial Ass'n* v. *Dixon Funeral Home, Inc.*, 25 Ark. App. 18, 24, 751 S.W.2d 356, 359 (1988).

■ In *W. M. Bashlin Co.* v. *Smith*, 277 Ark. 406, 643 S.W.2d 526 (1982), the jury verdict was submitted on interrogatories concerning two grounds for recovery: (1) defective product liability, and (2) negligence. The court said:

> We have recognized that more than one theory of liability may properly be used in matters involving products liability. AMI 1012 provides first for a finding of a defect in the product and second that there was negligence on the part of the supplier. The plaintiff need not bear the burden of proving both theories of liability, it is enough that he prove either.

277 Ark. at 414. And in *E. I. DuPont de Nemours & Co.* v.

*Dillaha*, 280 Ark. 477, 659 S.W.2d 756 (1983), the jury returned a general verdict which could be sustained under both strict product liability and warranty theories. In affirming the trial court's judgment, the Arkansas Supreme Court said there was substantial evidence to sustain the jury's verdict under either theory. Therefore, we think the instant case must be affirmed under either the products liability or statutory liability theories, regardless of the warranty theory. The abstract simply does not show that any alleged error on the first two theories was preserved for appeal, and the only theory for recovery that is contested on appeal is the one based on breach of warranty. However, if we do need to examine the implied warranty issue, we find that the case should also be affirmed on that theory.

We find no Arkansas case clearly in point on the issue of the application of Arkansas law to the claims based upon breach of implied warranty. Arkansas Code Annotated Section 4-1-105(1) (1987) provides as follows:

> Except as provided hereafter in this section, when a transaction bears a reasonable relation to this state and also to another state or nation, the parties may agree that the law either of this state or of such other state or nation shall govern their rights and duties. Failing such agreement, this subtitle applies to transactions bearing an appropriate relation to this state.

Comments 2 and 3 to Ark. Stat. Ann. Section 85-1-105 (Add. 1961) (now Ark. Code Ann. Section 4-1-105 (1987)) state:

> 2. Where there is no agreement as to the governing law, the Act is applicable to any transaction having an "appropriate" relation to any state which enacts it. Of course the Act applies to any transaction which takes place in its entirety in a state which has enacted the Act. But the mere fact that suit is brought in a state does not make it appropriate to apply the substantive law of that state. Cases where a relation to the enacting state is not "appropriate" include, for example, those where the parties have clearly contracted on the basis of some other law, as where the law of the place of contracting and the law of the place of contemplated performance are the same and are contrary to the law under the Code.

3. Where a transaction has significant contacts with a state which has enacted the Act and also with other jurisdictions, the question what relation is "appropriate" is left to judicial decision. In deciding that question, the court is not strictly bound by precedents established in other contexts. Thus a conflict-of-laws decision refusing to apply a purely local statute or rule of law to a particular multistate transaction may not be valid precedent for refusal to apply the Code in an analogous situation. Application of the Code in such circumstances may be justified by its comprehensiveness, by the policy of uniformity, and by the fact that it is in large part a reformulation and restatement of the law merchant and of the understanding of a business community which transcends state and even national boundaries. Compare Global Commerce Corp. v. Clark-Babbitt Industries, Inc., 239 F.2d 716, 719 (2d Cir. 1956). In particular, where a transaction is governed in large part by the Code, application of another law to some detail of performance because of an accident of geography may violate the commercial understanding of the parties.

The trial court apparently believed that the transactions in the case at bar were "transactions bearing an appropriate relation to this state." Clearly, there was no agreement by the parties as to which state's law would govern.

■ In *Wallis* v. *Mrs. Smith's Pie Co.*, 261 Ark. 622, 550 S.W.2d 453 (1977), the Arkansas Supreme Court was presented with an issue involving the proper choice of law in a tort case resulting from a motor vehicle accident, and the court expressed approval of Dr. Robert Leflar's "choice-influencing considerations," which are: (1) predictability of results; (2) maintenance of interstate and international order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interests; and (5) application of the better rule of law. *See also* R. Leflar, L. McDougal, & R. Felix, *American Conflicts Law* Section 95, at 279 (4th ed. 1986). In *Wallis*, the supreme court reversed the trial court's application of Missouri's contributory negligence statute, because it found that Arkansas' comparative fault statute is a better rule of law. The supreme court stated:

This State's governmental interest in its citizens is best served by application of our comparative fault statute rather than Missouri's contributory negligence law. As expressed in *Clark* v. *Clark*, 107 N.H. 351, 222 A.2d 205 (1968), probably the truest governmental interest the forum has is "in the fair and efficient administration of justice," and in our opinion application of our statute better achieves that result.

261 Ark. at 632, 550 S.W.2d at 458.

Arkansas Code Annotated Section 2-40-101(c) (1987) provides:

Any person who shall bring in, or cause to be brought in, to the state any animal suffering from a contagious or infectious disease or that has been exposed to the contagion or infection of any disease, knowing it to have been so diseased or to have been so exposed, shall be guilty of a misdemeanor. Upon conviction, an offender shall be fined in any sum not to exceed five hundred dollars ($500). He shall, moreover, be liable for damages to others due to infection from the animal.

Thus, it is clear that Arkansas has a state interest in preventing the bringing of diseased livestock into this state.

In the treatise *American Conflicts Law*, the authors state:

[S]ome choice-of-law statutes have been intelligently framed, with deliberate and foresighted planning of antici- pated consequences. Section 1-105(1) of the Uniform Commercial Code is an example. It reads:

Except as provided hereafter in this section, when a transaction bears a reasonable relation to this state and also to another state or nation the parties may agree that the law either of this state or of such other state or nation shall govern their rights and duties. Failing such agreement this Act applies to transactions bearing an appropriate relation to this state.

Then certain areas of the new law are excepted, and more specific choices of law are laid down for them. The two

ideas that are basic to the main part of this enactment are (1) parties should be free to plan their transactions with reference to what relevant law is to govern them, and (2) if they have not so planned a given transaction, the "better law" (which has an appropriate relation to the transaction) should govern it. The Uniform Commercial Code constitutes the best and most carefully formulated body of commercial law available anywhere, and this is good reason for making it the governing law.

R. Leflar, L. McDougal & R. Felix, *American Conflicts Law* Section 101, at 286-87 (4th ed. 1986).

Appellants rely on *McMillen* v. *Winona Nat'l & Savings Bank*, 279 Ark. 16, 648 S.W.2d 460 (1983). That case is distinguishable from the case at bar, because in *McMillen*, the documents recited that Minnesota law would govern. The court stated:

> The trial court held that Minnesota law should apply and we agree. The principal significant contracts [sic] were in Minnesota. *Standard Leasing Corp.* v. *Schmidt Aviation, Inc.*, 264 Ark. 851, 576 S.W.2d 181 (1979). More important, Brooks, the central figure and moving force in this whole transaction, initiated the entire arrangement. He contacted the Minnesota seller, told them financing would have to be arranged through them, and it was entirely at his behest that the matter had any contact at all with Arkansas. This makes the situation different from one where an out-of-state seller initiates contacts in Arkansas. *See Tri-State Equipment Co.* v. *Tedder*, 272 Ark. 408, 614 S.W.2d 938 (1981); *Standard Leasing Corp.* v. *Schmidt Aviation, Inc.*, *supra*; *Lyles* v. *Union Planters National Bank*, 239 Ark. 738, 393 S.W.2d 867 (1965). The documents, reciting that Minnesota law would govern, were mailed to Brooks' lawyer in Arkansas, signed in Arkansas by the buyers, and then signed in Minnesota by the seller.

> What contact did the Winona bank have with Arkansas? None at all. Did a Minnesota company initiate a sale to an Arkansan? No. Did the parties intend for Arkansas law to apply? Certainly there is no evidence of it, except those facts recited and Brooks' testimony that that was his

intent. Brooks, of course, was the key to the matter and he sought to buy equipment financed by an out-of-state bank. The fact the contract was actually signed in Arkansas, and the investors never went to Minnesota cannot overcome the opposite facts: That Winona did not seek out the investors, and neither did it ever come to Arkansas; and that the contract expressly provided Minnesota law would govern. [citations omitted]

Although the trial court's finding in such cases is not always critical, it has to be given some weight because a fact question did exist and the trial court found the facts to be in favor of Winona. We will not reverse that finding unless it is clearly contrary to the preponderance of the evidence. *Tri-State Equipment Co.* v. *Tedder, supra.*

279 Ark. at 18-19, 648 S.W.2d at 462.

Appellants also rely on *Tri-State Equip. Co.* v. *Tedder,* 272 Ark. 408, 614 S.W.2d 938 (1981). In *Tri-State,* the Arkansas Supreme Court agreed with the trial court that the contract in question was an Arkansas contract and void under Arkansas' usury law in spite of the fact that the agreement stated that it would be governed by Tennessee law. In that case, the supreme court noted that all negotiations surrounding the transaction were conducted in Arkansas: the equipment was ordered and delivered, the contract was signed, the trial of the machinery and approval occurred, and the sales tax was paid in Arkansas. The court stated:

From the evidence presented, the chancellor could certainly conclude that in spite of a provision to the contrary, the contract was an Arkansas contract and should be governed by Arkansas law. We will not reverse the findings of the chancellor unless they are clearly contrary to the preponderance of the evidence.

272 Ark. at 410, 614 S.W.2d at 940.

Appellants also rely on *Myers* v. *Council Mfg. Corp.,* 276 F. Supp. 541 (W.D. Ark. 1967), where the district court held that Arkansas law applied to the issue of whether there must be privity for the purchaser to maintain an action for breach of implied warranty. In *Myers,* the purchaser was a resident of Washington

but negotiated with a local salesman and distributor for the purchase of equipment manufactured in Arkansas; the contract of sale was consummated in Arkansas upon acceptance of the purchase order and delivery of the equipment to a carrier, f.o.b. Arkansas. In its decision, the district court relied upon the 1959 edition of Dr. Leflar's treatise. Appellees contend that appellants' reliance on *Myers* is misplaced because *Myers* does not hold what constitutes an "appropriate relation" under Section 4-1-105(1) in the warranty context. Additionally, *Myers* was decided in 1967, before the Arkansas Supreme Court enunciated in *Wallis* its adoption of Dr. Leflar's "choice-influencing considerations."

■ Appellants point to the fact that appellees went to the state of Missouri to purchase the dairy cattle; they negotiated the purchase with appellants in Missouri; and the sales were consummated in Missouri. They also rely on the fact that, after the disease problem was identified, appellees went to Missouri to discuss the problems with appellants. It is appellants' contention that all of the principal significant contacts between the parties occurred in Missouri.

Appellees argue, however, that Arkansas' own governmental interest in protecting its citizens and livestock from the spread of infectious disease warrants a finding that the transactions in question bear an appropriate relation to this state. They point out that both plaintiffs were residents of the state of Arkansas; the injuries and damages sustained occurred in Arkansas; the suit was filed in Arkansas; and at least some of the cattle were delivered by appellants or their agents to the appellees in Arkansas. We agree with the appellees' argument and, under the factual circumstances and the considerations expressed in the *Wallis* case, *supra*, we cannot say that the trial court erred in applying the law of Arkansas to the transactions in this case.

■ For their second point on appeal, appellants argue that the trial court erred in denying appellants' challenge to a juror for cause. Appellants contend the juror should have been excused for cause because she had a business relationship with appellee Worsham for about five years prior to trial. On voir dire, she informed the court that she had prepared Worsham's income tax returns but stated that she did not believe their prior business relationship would influence her decision in any way. Appellants

moved to strike this juror for implied bias due to the employer-employee or master-servant relationship. They also argued that she was privy to Worsham's income tax and financial records, which might be relied upon to establish damages. Appellees countered that the juror did not fall in the employer-employee or master-servant categories and that the income tax returns would not be introduced into evidence. The trial court denied the challenge for cause. We first point out that appellants' abstract does not show that appellants exhausted their peremptory challenges, and under the decision of *Mason* v. *Loving*, 251 Ark. 356, 359, 473 S.W.2d 169 (1971), we are not required to examine this contention on its merits. We also point out that there is no argument made by appellants in regard to the amount of the jury verdicts; therefore, we do not find any merit in the suggestion that this juror was privy to Worsham's income tax information.

Arkansas Code Annotated Section 16-33-304(b)(2) (1987) provides in pertinent part:

(2) Particular causes of challenge are actual and implied bias.

(A) Actual bias is the existence of such a state of mind on the part of the juror, in regard to the case or to either party, as satisfies the court, in the exercise of a sound discretion, that he cannot try the case impartially and without prejudice to the substantial rights of the party challenging.

(B) A challenge for implied bias may be taken in the case of the juror;

(i) Being related by consanguinity, or affinity, or stands in the relation of guardian and ward, attorney and client, master and servant, landlord and tenant, employer and employed on wages, or is a member of the family of the defendant or of the person alleged to be injured by the offense charged, or on whose complaint the prosecution was instituted. . . .

The qualification of a juror is within the sound judicial discretion of the trial court, who has an opportunity to

observe the veniremen that this court does not have, and the trial court will not be reversed unless the appellant demonstrates an abuse of discretion. *Hobbs* v. *State*, 277 Ark. 271, 274, 641 S.W.2d 9, 11 (1982); *Henslee* v. *State*, 251 Ark. 125, 127, 471 S.W.2d 352, 354 (1971); *Rumping* v. *Ark. Nat'l Bank*, 121 Ark. 202, 211, 180 S.W. 749, 752 (1915). The fact that a juror has done business with one of the litigating parties does not *ipso facto* disqualify him as a prospective juror. *Walker* v. *State*, 237 Ark. 34, 37, 371 S.W.2d 135, 137 (1963). In *Rumping, supra*, the supreme court stated:

> The mere fact that the juror was indebted to one of the parties did not necessarily disqualify him. Jurors who are accepted by the court as men of sufficient intelligence to decide upon questions of fact, are expected to forget their friendships for one of the parties even though that friendly feeling should be based on past favors. [citation omitted]

121 Ark. at 211, 180 S.W. at 752.

Appellants rely on *Caldarera* v. *Giles*, 235 Ark. 418, 360 S.W.2d 767 (1962), in arguing that the trial court erred in not excusing the juror challenged for cause in the present case. *Caldarera* is distinguishable. In that case, the juror withheld information that he had a pecuniary interest in the proceeds from the verdict in the case.

In the case at bar, the juror clearly did not fall into the employer-employee or master-servant relationship, from which bias will be implied. Additionally, appellants failed to demonstrate actual bias on her part. We find no error in the trial court's refusal to strike this juror.

Affirmed.

CRACRAFT and JENNINGS, JJ., agree.